FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>KELECHI AJOKU, AKA Kelechi Ajouku,<br>*Defendant-Appellant*. | No. 11-50230<br><br>D.C. No.<br>2:08-cr-01094-WDK-5<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
William D. Keller, Senior District Judge, Presiding

Argued and Submitted
January 11, 2013—Pasadena, California

Filed June 3, 2013

Before: Alfred T. Goodwin, Michael Daly Hawkins,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Hawkins

## SUMMARY[*]

### Criminal Law

The panel affirmed a jury conviction of making false statements relating to health care matters in violation of 18 U.S.C. § 1035.

Rejecting the defendant's sufficiency-of-the-evidence challenge, the panel reasoned: (1) a § 1035 violation requires a finding that the "matter" involved a health benefit program, not that the particular "statement" falsified or covered up involved a health benefit program; (2) it was immaterial that the defendant's statements were made to California investigators (rather than directly to federal authorities) in a matter affecting the delivery of federal Medicare payments; (3) there was sufficient evidence of materiality to Medicare; (4) there was sufficient evidence of the defendant's knowing falsehood; and (5) there was sufficient evidence to find that the defendant was aware the certified deliveries of devices were not occurring and deliberately avoided the truth.

The panel held that whatever the merits of the defendant's contention that the jury could not return a guilty verdict under a concealment theory without finding the defendant owed a duty to disclose the truth, an issue that has never been decided by this court, any error was not plain.

Holding that the district court did not err in instructing the jury on "willfulness," the panel applied to § 1035 the same

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

definition used for the general false statements statute, 18 U.S.C. § 1001: willful "means no more than that the forbidden act is done 'deliberately and with knowledge.'" Regarding materiality, the panel held that the district court's instruction properly limited the jury to considering whether the defendant's statements were capable of influencing a decision or activity in a matter involving a health care benefit program.

The panel rejected the defendant's contention that the district court admitted inflammatory and unduly prejudicial evidence concerning the scope of the alleged billing fraud.

## COUNSEL

Ethan A. Balogh (argued) and Jay A. Nelson, Coleman & Balogh, San Francisco, California, for Defendant-Appellant.

Aaron M. May (argued), Assistant United States Attorney, Andre Birotte Jr., United States Attorney, Robert E. Dugdale, Assistant United States Attorney, Chief, Criminal Division, Monica D. Mange, Assistant United States Attorney, United States Attorney's Office, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

HAWKINS, Senior Circuit Judge:

Kelechi Ajoku ("Ajoku"), convicted of four counts of making false statements relating to health care matters (18 U.S.C. § 1035) and sentenced to thirteen months

incarceration plus restitution, appeals, arguing the district court erred by: (1) denying his motion for judgment of acquittal on all counts because the government presented insufficient evidence to support the convictions; (2) failing to instruct the jury that a duty to disclose is an element of false statements by concealment; (3) improperly instructing the jury on the elements of willfulness and materiality; and (4) admitting inflammatory and unduly prejudicial evidence concerning the scope of the alleged billing fraud. He also argues that the cumulative effect of these errors requires reversal. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## FACTS AND PROCEDURAL HISTORY

In 2005, Ajoku, a licensed vocational nurse, was offered a job to serve as the "exemptee" for the Santos Medical Supply Company ("Santos") at a salary of $400 per month. Under California regulations, an exemptee, acting like a pharmacist, is responsible for maintaining and distributing prescription medical devices for retailers like Santos. Cal. Health & Safety Code §§ 111656.4–111656.5. Santos did not require Ajoku, who was working 70–80 hours a week at two other jobs, to actually perform the functions of exemptee as a condition of compensation. Rather, Ajoku was required only to complete paperwork and remain on call to come into the business and answer questions if government inspectors visited the facility.

Ajoku agreed to the arrangement and prepared an application for his exemptee license. When his first exemptee application was rejected due to insufficient information, Ajoku supplemented the application by signing a backdated employment contract and an affidavit that stated he would be

present whenever prescription devices were dispensed and he would have exclusive control over the items—facts Ajoku knew to be false. After Ajoku received his license, he was paid a $300 bonus, and put on the Santos payroll. Santos immediately began to bill Medicare for device sales— something it could not lawfully do without a state licensed exemptee.

Although Ajoku was unaware that Santos was entirely organized and executed to defraud Medicare by billing the program for medical devices never delivered, Santos's sham transactions would not have been possible with a real exemptee ensuring the prescription devices were distributed in accordance with state regulations. Santos ultimately billed Medicare for $2.9 million in fraudulent claims, for which it was paid approximately $1.8 million.

Ajoku never performed the duties of an exemptee but would visit Santos from time-to-time to complete paperwork for the group. In 2005, Ajoku completed and signed multiple training forms certifying to Medicare that he had delivered and trained patients to use motorized wheelchairs even though he had not done so. Ajoku renewed his exemptee license annually from 2006 through 2008, each year certifying to California that he was working as a proper exemptee for Santos.

On April 16, 2008, a California Department of Public Health inspector visited Santos and Ajoku was summoned to answer his questions. Though Santos passed the inspection, the investigator tipped off Medicare officials of possible fraud at the company. On May 2, 2008, two agents of the U.S. Department of Health and Human Services visited Santos wearing hidden video and audio recorders. Ajoku was

again called in to pose as an active exemptee for Santos. Answering the agents' questions, Ajoku asserted that he had responsibility for storing and distributing the prescription goods and training patients on their use. After a few minutes, Ajoku ended the line of questioning by telling the agents he had to go.

A federal grand jury subsequently returned an indictment against Ajoku and other members of the Santos operation, the final version of which alleged health care fraud, conspiracy to commit health care fraud, and false statements. By the time of trial, everyone but Ajoku had entered guilty pleas. The government proceeded to trial on the false statement counts (18 U.S.C. § 1035) and Ajoku was convicted on each count.

## DISCUSSION

### I.  Sufficiency Challenges

We review de novo claims of insufficient evidence, asking whether the evidence, viewed in the light most favorable to the prosecutor, could allow "any rational trier of fact" to find the essential elements of the crime beyond a reasonable doubt. *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis omitted).

### A.  The Jurisdictional Element

There was sufficient evidence to convict Ajoku of making a false statement relating to a health care benefit program for his communication with California officials under 18 U.S.C. § 1035(a). That section provides:

> Whoever, in any matter involving a health care benefit program, knowingly and willfully—
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or
>
> (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,
>
> in connection with the delivery of or payment for health care [shall be punished accordingly].

A plain reading of 18 U.S.C. § 1035(a) reveals that the jury was required to find that the "matter" involved a health benefit program, not that the particular "statement" falsified or covered up involved a health benefit program. *Id*. The jury was presented with evidence that Ajoku's statements and writings were made in connection with the delivery of and Medicare payment for prescription devices because Santos could not bill Medicare for devices without employing and utilizing a qualified exemptee under California law.

We need not address the outer limit of whether a statement "involv[es]" a health care program for the purposes of § 1035 because there was sufficient evidence to determine that Ajoku's statements to California authorities were made in a matter involving Medicare. While Ajoku made his statements to California rather than federal authorities, we

have held that false statements that are not made to federal authorities but that concern matters of interest to the federal government may fall within federal oversight. For example, § 1035 is substantially identical to 18 U.S.C. § 1001, which sanctions anyone who "knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation" concerning "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States . . . ." We have previously held that § 1001 encompasses statements involving matters of federal concern, even when those statements were made to state investigators. *See United States v. King*, 660 F.3d 1071, 1081 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2740 (2012) (holding that false statements made to an Idaho agricultural inspector were sufficiently tied to federal interests to violate § 1001). We have also held that § 1001 encompasses false documents that were never actually provided to any governmental entity, so long as they were intended to be used in a matter of federal concern. *See United States v. Balk*, 706 F.2d 1056, 1059 (9th Cir. 1983) ("Under section 1001, the falsified documents did not have to be submitted to the Navy; it is only necessary that their intended use be related to a matter within the jurisdiction of the Navy."). Given our precedent, it is immaterial that Ajoku's statements were made to California investigators rather than directly to federal authorities. Instead, it is sufficient for the purposes of § 1035 that the statements were made to state authorities in a matter affecting the delivery of federal Medicare payments.

### B. Materiality to Medicare of State Regulatory Compliance

Ajoku was charged in count one with falsifying, concealing, or covering up that Santos maintained and

distributed syringes outside his presence and control. A statement is material if it has "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)). The jury heard sufficient evidence that Ajoku's statements and concealment were addressed to Medicare. Among other things, Ajoku concedes that some of his statements to investigators were directed to Medicare. His other statements included his application for the exemptee license, the annual renewals, and his participation in a regulatory compliance inspection. This license was sent to Medicare on four occasions. Further, there was evidence that Ajoku's statements and concealments had the ability to influence Medicare: Medicare officials would not have paid Santos's billing claims had it been informed that Ajoku was not exercising exemptee responsibility over medical devices, like feeding syringes.

## C. Proof of Knowing Falsehood

There was also sufficient evidence that Ajoku knowingly provided false information to Medicare investigators in the form of circumstantial evidence sufficient to establish both actus reus and mens rea. *See In re Khalil*, 578 F.3d 1167, 1169 (9th Cir. 2009) ("Fraudulent intent may be inferred from a pattern of behavior."). For example, there was undisputed evidence that: (1) Santos did not deliver enteral nutrition with syringes; (2) Ajoku told the agents otherwise; and (3) Ajoku was paid to take the title of exemptee without ever exercising any of its duties. Ajoku took the position at trial that he believed his statements to be true and that some of the statements were true, if interpreted within the proper context. However, required, as we are, to view the evidence in the

light most favorable to the government, *see Jackson*, 443 U.S. at 319, we cannot say that the record required "any rational trier of fact" to choose Ajoku's interpretation over that of the government. *Nevils*, 598 F.3d at 1163–64.

### D. Imputation of Knowledge to a Willfully Blind Defendant

Ajoku argues that the jury was presented with insufficient evidence to find that he falsely represented that the named patients were supplied and trained on motorized wheelchairs as charged in counts two through four of the trial indictment because there was no evidence that he knew Santos did not deliver the wheelchairs and delivered cheap motor scooters instead.

While there is no evidence that Ajoku actually knew about Santos's scam, the doctrine of willful blindness imputes knowledge to a "defendant who all but knew the truth—a defendant who suspects a fact, realizes its high probability, but refrains from obtaining final confirmation in order to be able to deny knowledge if apprehended." *United States v. Heredia*, 483 F.3d 913, 928 (9th Cir. 2007) (internal quotation marks and citations omitted). Ajoku signed forms stating that he was the person who had delivered motorized wheelchairs to the three named individuals and had trained them on the use of the wheelchairs, knowing he had never done any such thing. Ajoku may not have been told that Santos failed to deliver wheelchairs to the patients, but he certainly did know that he, the responsible technician, had not delivered the wheelchairs, and he never asked who delivered the wheelchairs instead of him.

The jury thus had sufficient evidence to find that Ajoku was aware the certified deliveries were not occurring and deliberately avoided learning the truth. *See id.*

## II.  Duty to Disclose

Ajoku argues for the first time on appeal that the district court erred in failing to instruct the jury that it could not return a guilty verdict under a concealment theory without finding Ajoku owed a duty to disclose the truth. In the absence of a preserved objection, we apply plain error review for the jury instruction claim and may reverse only if any instructional error was clearly erroneous under current law. *See United States v. Olano*, 507 U.S. 725, 734 (1993). Having no clearly established law to guide its decision, any error in omitting an element from the instruction was not plain. *See id*. Whatever the merits of this contention, the issue has never been decided by this court. Therefore, the error, if any, was not plain.

## III.    Jury Instruction on Willfulness

The mens rea element of 18 U.S.C. § 1035 is "knowingly and willfully." The Supreme Court has described willfully as "a word of many meanings whose construction is often dependent on the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998) (internal quotation marks and citation omitted).

In the context of false statement crimes, however, willfulness simply means "deliberately and with knowledge," and does not require knowledge of unlawfulness. *United States v. Tatoyan*, 474 F.3d 1174, 1182 (9th Cir. 2007) (citing *Browder v. United States*, 312 U.S. 335, 341 (1941))

(interpreting 18 U.S.C. § 1001); *see also United States v. Heuer*, 4 F.3d 723, 732 (9th Cir. 1993) (same). This is consistent with the "traditional rule," recognized in *Bryan* that ignorance of the law is no defense. 524 U.S. at 196.

18 U.S.C. § 1035 is a false statement crime substantively identical to 18 U.S.C. § 1001, except that § 1035 is jurisdictionally limited to matters involving a health care benefit program and § 1001 is jurisdictionally limited to matters within the jurisdiction of the executive, legislative, or judicial branch of the United States government. Both statutes use nearly identical language. While § 1035 sanctions anyone who "knowingly and willfully . . .makes any materially false, fictitious or fraudulent statements or representations," § 1001 sanctions anyone who "knowingly and willfully . . .makes any materially false, fictitious or fraudulent statement or representation." If this nearly identical language were not enough, Congressional intent behind both statutes was also similar; both statutes are intended to protect federal interests from the harms of knowing and willful fraud and deception.[1] Where two statutes use similar language and were enacted for the same purpose, it is appropriate to interpret the language of the statutes *pari passu. See Northcross v. Bd. of Ed. of Memphis City Sch.*, 412 U.S. 427, 428 (1973). This interpretive rule "is a reflection of practical experience in the

---

[1] The current version of 18 U.S.C. § 1001 was enacted to "protect the authorized functions of governmental departments and agencies from the perversion which might result from . . . deceptive practices," *United States v. Rodgers*, 466 U.S. 475, 480 (1984) (quoting *United States v. Gilliland*, 312 U.S. 86, 93 (1941)). 18 U.S.C. § 1035 was enacted as part of Health Insurance Portability and Accountability Act of 1996, legislation that was intended in part to "combat waste, fraud and abuse in health insurance and health care delivery . . . ." Pub. L. No. 104-91, tit. II, § 244(a), 110 Stat. 2017 (1996).

interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context." *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972). We therefore apply the same definition of willful used for the general false statements statute to interpret willful in 18 U.S.C. § 1035: willful "means no more than that the forbidden act is done 'deliberately and with knowledge.'" *United States v. Carrier*, 654 F.2d 559, 561 (9th Cir. 1981) (quoting *Hirsch v. INS*, 308 F.2d 562, 567 (9th Cir. 1962)) (defining "willful" for purposes of 18 U.S.C. § 1001). Accordingly, the prosecution was required only to show that Ajoku's statements were made deliberately and with knowledge that the statements were untrue or the document was false. Because the district court so instructed the jury, it did not err.

## IV.    Jury Instruction on Materiality

Because Ajoku did object to the instructions on materiality, we review de novo to determine whether the instructions omitted or misstated an element of the crime. *See United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997). Ajoku contends that the jury instructions were vague and overbroad because the district court failed to add the phrase "involving a health care benefit program" to the jury instruction on materiality.  However, the same instruction told the jurors that they could not convict Ajoku unless they found that his statements were made in a matter "involving a health care benefit program." Though the court did not use the "precise words" preferred by Ajoku, the instruction properly limited the jury to considering whether Ajoku's statements were capable of influencing a decision or activity in a matter involving a health care benefit program. *See United States v. Frega*, 179 F.3d 793, 807 (9th Cir. 1999).

## V.  Admission of Evidence Regarding the Scope of the Fraud

Non-constitutional evidentiary decisions are reviewed for abuse of discretion and reversal is appropriate only if the error "more likely than not affected the verdict." *United States v. Decoud*, 456 F.3d 996, 1010 (9th Cir. 2006) (internal quotation marks and citations omitted). The probative value of the details of the Santos operation in determining whether Ajoku's statements involved and were material to Medicare outweighed any prejudice. *See* Fed. R. Evid. 402. Ajoku suggests no evidence that the government could have presented to establish the elements absent the financial effect of the fraud. *See Old Chief v. United States*, 519 U.S. 172, 186 (1997). While Ajoku was personally unaware of the scope of the fraud, the details of the scheme were not so viscerally abhorrent to the jurors as to preclude them from viewing the rest of the case fairly. *See United States v. Merino-Balderrama*, 146 F.3d 758, 762–63 (9th Cir. 1998) (district court admission of child pornography with "graphic sexual conduct" was error because of unduly prejudicial effect of "inflammatory"evidence).

## VI.     Cumulative Error

There was sufficient evidence to support Ajoku's convictions, and no plain error or abuse of discretion in the jury instructions or the admission of evidence. Because we determine no error occurred, there is no cause to conduct a review under the cumulative error doctrine. *United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007).

**AFFIRMED.**