# United States Court of Appeals
## For the First Circuit

No. 12-1315

UNITED STATES,

Appellee,

v.

RODNEY L. RUSSELL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

William S. Maddox for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with
whom Thomas E. Delahanty II, United States Attorney, was on brief,
for appellee.

August 26, 2013

**THOMPSON, <u>Circuit Judge</u>.** Appellant Rodney L. Russell applied for and received government subsidized health care coverage for several years. Although Russell was working under the table during those years, he claimed on his renewal applications that he had no income to report. After a government investigation, indictment, and multi-day trial, a jury convicted Russell of making false statements in connection with the payment of health care benefits, 18 U.S.C. § 1035(a)(2). On appeal, Russell attacks his conviction on multiple grounds. After careful consideration, we affirm.

## BACKGROUND

### A. Health Care Subsidy

We walk through the relevant facts in the light most favorable to the verdict. <u>United States</u> v. <u>Mercado</u>, 412 F.3d 243, 245 (1st Cir. 2005).

Shortly after losing his job and accompanying health insurance in 2006, Russell applied for subsidized health insurance coverage through the Dirigo Health Agency's DirigoChoice Health Program ("Dirigo"). In 2003, the Maine legislature created Dirigo Health Agency to expand access to health insurance coverage for Maine citizens who cannot otherwise afford it. Dirigo negotiates competitive rates and benefit packages with private insurance carriers. Through the DirigoChoice Program ("Dirigo Choice"), the agency also subsidizes insurance premiums for Maine citizens whose

income level falls below 300% of the federal poverty level.  The subsidy must be renewed every twelve months.

To qualify for the subsidy, applicants must fill out two applications:  an insurance application to the insurance carrier and a subsidy application to Dirigo.  The applicant certifies the subsidy application and submits supporting documentation, such as income tax returns and proof of income.  The primary determinants of subsidy eligibility are income and household size.

In 2006, after losing his job as a stockbroker and financial advisor at the retirement investment firm Commonwealth Financial Network d/b/a Brown Company, and his accompanying health insurance, Russell applied for and received subsidized health insurance coverage through Dirigo Choice.  Russell's 2006 application included information about his employment and income, as well as a pay stub from the Bureau of Unemployment Compensation.[1]  It also included a signed certification statement that read:

> In signing this statement, I certify that I meet the eligibility requirements checked above.  If I'm covering my spouse/domestic partner, I certify that he/she also meets individual eligibility requirements.  I will contact the Dirigo Health Agency if my circumstances change.  I understand that failure to do so may result in loss of coverage for me and my family members.

---

[1]Russell received unemployment benefits roughly between October 2006 and March 2007.

The following year, Russell applied to renew his subsidy. Where the application asked about gross wages, tips and salaries, Russell responded, "not available."  Russell also indicated "not available" when asked about his net self-employment income and gross receipts minus allowable business expenses.  He reported an $8,000 IRA withdrawal, $575 monthly rent, and $600 cash left in his account which he said he would be "taking out soon."  Russell signed a verification clause on the application which read in pertinent part:

> I understand the questions on this form.  All statements and answers I have given are true and complete.  The Dirigo Health Agency . . . may check information submitted on this form . . . . I understand it's a crime to knowingly provide false, incomplete, or misleading information on this form and that I could be charged with perjury.

Relying on the information in Russell's application, in November 2007, Dirigo awarded him an 80% subsidy in the amount of $4,100 for another full year of coverage (December 1, 2007 through November 2008).[2]

Russell applied to renew his subsidy a second time on October 29, 2008.  The 2008 renewal application included his 2007 tax return and reported IRA distributions of $9,133.33 and unemployment benefits of $4,160 for a total income of $13,293.33. Russell represented he had no gross wages, tips, or salaries before

---

[2]At the time of Russell's renewal application, the income cut off was $14,700.

deductions to report by responding "zero" on the relevant section of the application. He also signed a similar certification that accompanied his 2007 renewal application. Relying on the information provided in the 2008 renewal application, Dirigo awarded Russell an 80% subsidy in the amount of $7,500.[3]

A year later in 2009, Russell submitted a third renewal application. He represented he had no gross wages, tips, salaries, or self-employment income by answering "zero" on the relevant lines in the application. He also completed the same certification that accompanied his 2007 and 2008 renewal applications. In an October 29, 2009 email exchange with Tarnya Brunelle, an eligibility specialist at Dirigo, Russell confirmed that he had "not received unemployment benefits or any other kind of income since spring 2007." Based on Russell's representations in his 2009 renewal application, Dirigo awarded him an 80% subsidy in the amount of $4,100.

For three years -- 2007, 2008, and 2009 -- Russell had received a subsidy based on his representations on each application that he had no income to report and that he was unemployed, but neither turned out to be true. He had in fact been working for his high school friend, Malcolm French, all along.

_____

[3]At the time of Russell's 2008 renewal application, the income cutoff for the subsidy was $15,600.

## B.  The Trial

A federal grand jury investigation eventually led to an indictment charging Russell with six counts of making false statements in receiving health care benefits in violation of 18 U.S.C. § 1035(a)(2).  Each count corresponds to the date of an alleged false statement:  November 7, 2007, the date of Russell's 2007 renewal application (Count One); October 26, 2008, the date of his 2008 renewal application (Count Two); October 29, 2008, the date of the signed certification that accompanied the 2008 renewal application (Count Three); October 23, 2009, the date of the 2009 renewal application (Count Four), and the date of the signed certification (Count Five); and October 29, 2009, the time stamped on the email exchange between Russell and Burnell from Dirigo (Count Six).  The case proceeded to trial on April 25, 2011.

### 1.  Employment with Malcolm French

At trial, the government presented evidence that Russell, after losing his job at the Brown Company in 2006, started working in some capacity for French.  French owns several businesses including:  Cold Stream Contracting, a gravel and construction business;[4] Malcolm French Professional Forestry, which cuts trees, hauls wood, and performs other forestry services; Malcolm French Logging; and a garage in Enfield (now in LaGrange), Maine.

---

[4]French has employees put ground cover over salmon culverts on Cold Stream Contracting property.

-6-

The jury heard testimony from French employees that they had seen Russell working in French's office. Steven Benson Jr., a French employee, testified he saw Russell work in French's office once or twice every two or three weeks when Benson dropped off paperwork. When Benson dropped off paperwork, he would pass it to Russell if Russell was there. According to Benson, Russell used the computer in the office on at least one occasion and several times endorsed checks with a rubber stamp bearing French's name.[5] If Benson called looking for French, Russell sometimes answered the phone. Another employee of French, Jeffrey Fogg, testified that he saw Russell at the computer in the office and recalled giving Russell time cards and receipts from different purchases.

In addition to the testimony of French's employees, Russell's ex-wife, Julie Plummer, testified that Russell wore work boots, worked late, and complained about working hard and doing backbreaking work. Rhonda Henderson, Russell's current wife, testified that shortly after they met in August 2007, Russell introduced her to Malcolm French, and his wife, Barbara French. Russell claimed that he was working for himself cutting wood on French's land. At one point, Russell, according to Henderson, told her that he was helping Malcolm French install culverts to allow salmon to swim upstream on his (French's) property as part of the

---

[5]Benson did not see Russell after French built his new garage in LaGrange, Maine in 2009.

-7-

work done by an entity called Old Stream Conservation Associates. Bank records showed that Russell signed checks on behalf of Old Stream Conservation Associates.

Jerald Davis, an employee of Griffin Greenhouse Supplies in Maine, which sells greenhouse and nursery supplies, recalled speaking to Russell around a dozen times both in person and by telephone about purchasing supplies for Cold Stream Contracting. Davis remembered Russell in particular because he always paid for his purchases, such as $9,000-$11,000 worth of soil and multiple bags of fertilizer, using cash placed in Ziploc bags. Davis testified that Russell told him he needed these and other materials for the salmon culverts.[6]

## 2. Cash In

The government introduced evidence that French had been paying Russell in cash and Russell, in turn, paid his bills in cash. Bank records showed that between January 2007 and 2009, $30,000 cash was deposited into Russell's account, but there were no checks from Cold Stream Contracting (not to be confused with Old Stream Conservation); there might have been one check from French Professional Forestry. One French employee, who was always present when other French employees picked up their paychecks, testified that the employees received their paychecks in envelopes bearing

---

[6]Davis was not aware of a business called Old Stream Conservation Associates.

-8-

their names, but he never saw Russell's name on any of those envelopes.

### 3. Cash Out

Between 2007 and 2009, Russell, according to Henderson, paid $500 in monthly household bills and several thousand dollars for his daughter's college tuition in cash. As for Russell's rent, with the exception of a February 2007 payment, evidence at trial also showed his rent got paid with cash or money orders.

### 4. Boston Financial

But there was more. Through the testimony of a human resources specialist for Boston Financial in Rockland, Maine, the government put forth the resume and employment application Russell submitted in March or April 2010 for a customer service representative position with Boston Financial. Russell's resume stated that between January 2007 and August 2009, he was employed as Treasurer for Old Stream Conservation Association in Maine. He listed as his primary responsibilities managing the budget and bookkeeping. His resume also listed his prior employment as a financial advisor with the Brown Company and PaineWebber. Russell's completed employment application stated his starting and final salaries for Old Stream Conservation were $10 per hour. The application listed Old Stream's business address, French as his supervisor, and paying bills and communicating with agencies as his duties. Russell signed the application under the certification

attesting to its truthfulness.  After Russell passed a background check, Boston Financial hired him.

### 5.  Russell's Defense

The defense's theory, as indicated by closing arguments, was that there was no proof Russell ever received cash from French, or that Russell was even employed by French.  Russell, according to the defense, got by every day by living on cash gifts and loans from family and friends and reducing his daily expenses.[7]  And as far as the Boston Financial application, Russell listed employment for French only because he wanted to avoid the appearance of a gap in his employment history -- a gap he thought would raise red flags to Boston Financial and decrease his chances of getting hired.

After a four-day trial, the jury found Russell guilty on Counts Two through Five, but not guilty on Counts One and Six.  The district court denied Russell's renewed motion for a judgment of acquittal, or, in the alternative, a new trial.  Russell's appeal followed.

---

[7]Russell's brother and sister, as well as several of his friends, testified that they loaned Russell money between 2007 and 2009.  Attorney Michael Griffin testified that at French's request, he incorporated Old Stream Conservation in 2006.  According to Griffin, Old Stream Conservation did not employ Russell, but Russell did serve as the company spokesman and was authorized to sign checks on its behalf.

**DISCUSSION**

Russell claims multiple errors below. First, he challenges the jury instructions on willfulness under 18 U.S.C. § 1035(a)(2). Second, he contends that the government failed to present sufficient evidence that his alleged false statements were material to support the conviction. Third, Russell argues the district court erroneously excluded testimony by Henderson about his state of mind when applying for the job with Boston Financial in 2010. And finally, Russell makes multiple claims of prosecutorial misconduct. We address each argument in seriatim, providing additional facts as necessary.

## I. Jury Instructions

We start with Russell's challenge to the jury instruction on the definition of the willfulness element of 18 U.S.C. § 1035(a)(2). Because Russell preserved his objection to the district court's refusal to give his requested instruction, our review is de novo. United States v. Fernandez, Nos. 12-1289, 12-1290, 2013 WL 3215461, at *10 (1st Cir. June 26, 2013); United States v. Baird, 712 F.3d 623, 627-28 (1st Cir. 2013). We will reverse the district court's refusal to give the instruction "only if the instruction was (1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to

-11-

present his defense." Baird, 712 F.3d at 628; United States v. Whitney, 524 F.3d 134, 138 (1st Cir. 2008).

18 U.S.C. § 1035(a)(2), the charged offense, provides in pertinent part:

> (a) Whoever, in any matter involving a health care benefit program, knowingly and willfully
> . . .
>
> (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1035(a)(2).

In charging the jury, the district court described the elements of making a false statement in connection with a health care benefit program under § 1035(a)(2). The district court instructed that the government had to prove beyond a reasonable doubt six elements. The first was that Dirigo Choice, "administered by the Dirigo Health Agency, is a healthcare benefit program as that phrase is defined in these instructions." The second was that Russell "knowingly and willfully made a false statement substantially as charged in the indictment" for each count. The court instructed that "[a] false statement is made knowingly and willfully if Rodney Russell knew it was false or

-12-

demonstrated a reckless disregard for the truth with a conscious purpose to avoid learning the truth." The court told the jury that "[a] statement is false if it was untrue when made." To decide whether the defendant acted knowingly, the court continued, "you may infer he had knowledge of a fact if you find that he deliberately closed his eyes to a fact that otherwise would have been obvious to him." The jury was reminded that it was "entirely up to [them] to determine whether he deliberately closed his eyes to the fact and, if so, what inference, if any, should be drawn" and to "bear in mind that mere negligence or mistake in failing to learn the fact is not sufficient."

The court then explained the third element: that Russell "made the statement voluntarily and intentionally." The court described "voluntarily and intentionally" to "mean[] that the government must prove beyond a reasonable doubt that Mr. Russell did not make the statement by accident or mistake." The court's instructions then addressed the last three elements: that Russell "made the false statement in connection with a healthcare benefit program"; that Russell "made the false statement in connection with the delivery of or payment for healthcare benefits, items, or services"; and lastly, that Russell's "statement was material to the Dirigo Health Agency." On materiality, the court instructed the jury that "[a] material fact or matter is one that has a

-13-

natural tendency to influence or be capable of influencing the decision of the decisionmaker to whom it was addressed."

On appeal, as he did below, Russell says the court's jury instruction on the definition of willfulness was wrong. Relying on other circuit decisions interpreting the language of 18 U.S.C. § 1347, he claims that to convict for a violation of § 1035(a)(2), the government must not only prove that Russell's statements were false and that he knew they were false, but that he also knew that making those false statements was illegal. He says the district court's refusal to adopt his proposed instruction on willfulness, requiring that the government prove illegality or "bad purpose," was erroneous.[8]

We have not had the occasion to decide whether willfulness, as it is used in § 1035, requires the government to prove that the defendant knew that making the false statement was illegal. The Ninth Circuit, however, recently tackled this issue head-on in United States v. Ajoku, 718 F.3d 882 (9th Cir. 2013), and rejected the argument that Russell makes before us -- that the

---

[8]Russell proposed the following instruction on willfulness:

An act or failure to act is "willful" if done voluntarily and intentionally, and with the specific intent to do something the law forbids, or with specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law. Thus, if you find Rodney Russell acted in good faith, he cannot be guilty of the crime or crimes charged.

willfulness element of § 1035 requires knowledge of unlawfulness. Id. at 890. In Ajoku, the court explained that willfulness, in the context of false statement crimes such as 18 U.S.C § 1001, is defined as "deliberately and with knowledge"; proving the defendant knew making the false statement was illegal is not required. Id. at 889. Such an interpretation of the definition of willfulness, the court observed, is consistent with the traditional rule that "ignorance of the law is no defense." Id. (citing Bryan v. United States, 524 U.S. 184, 196 (1998)). The court went on to explain that the language in § 1001 (where it got its definition of willfulness) is nearly identical to that found in § 1035. Id. ("While § 1035 sanctions anyone who 'knowingly and willfully . . . makes any materially false, fictitious or fraudulent statements or representations,' § 1001 sanctions anyone who 'knowingly and willfully . . . makes any materially false, fictitious or fraudulent statement or representation.'"). The court noted that the only substantive difference between the two statutes is that § 1035 is limited to matters involving a health care benefit program, while § 1001 deals only with matters within the jurisdiction of the executive, legislative, or judicial branch of the federal government. Id. at 889.

In addition to the nearly identical language in these two criminal statutes involving false statements, the court observed that they were enacted for the same purpose: "to protect federal

interests from the harms of knowing and willful fraud and deception." Id. at 890. In light of their similar language and shared purpose, the court held that the same definition of "willful" used in § 1001 applies in interpreting "willful" in § 1035. Id. Because the district court's jury instructions used that definition -- i.e., "deliberately and with knowledge that the statements were untrue or the document was false" -- the Ninth Circuit concluded the district court did not err when instructing the jury. Id. We agree with the Ninth Circuit's reasoning and hold that, as used in § 1035, the "willfulness" element does not require the government to prove that the defendant knew it was a crime to make the particular false statement.

Russell's reliance on Bryan v. United States, 524 U.S. 184 (1998), to urge us to conclude otherwise is misplaced. In Bryan, the defendant was convicted of dealing in firearms without a license in violation of 18 U.S.C. § 924(a)(1)(D). 524 U.S. at 189-90. The defendant challenged his conviction, arguing that the court erred by failing to instruct that the government had to prove that he knew of the licensing requirement. Id. at 190. Russell latches onto the Supreme Court's observation that the word "willful," when used in the criminal context, generally means the act was undertaken with a "bad purpose." Id. at 191. But the Supreme Court also made clear that "[t]he word 'willfully' is sometimes said to be 'a word of many meanings' whose construction

-16-

is often dependent on the context in which it appears." Id. In the context of Russell's case, which involves a § 1035(a) violation, we agree with the Ninth Circuit that an instruction on "willfulness" does not necessarily require knowledge of illegality.

The other circuit decisions cited by Russell do not hold otherwise. See United States v. Jones, 664 F.3d 966, 981 (5th Cir. 2011) (holding only that a jury instruction lowering the mens rea requirement from "knowingly and willfully" to "knew, or should have known" was inappropriate); United States v. Delgado, 668 F.3d 219, 225 & n.3 (5th Cir. 2012) (merely noting, but not giving substance to, the willfulness requirement); United States v. Hayes, 574 F.3d 460, 477-78 (8th Cir. 2009) (motion for acquittal should have been granted where no evidence suggested that defendant was aware that false statement was being made).[9]

Because the district court here properly instructed the jury that the government need only prove that the defendant's statements were false and that the defendant knew they were false, we find no error.

---

[9]Russell's reliance on United States v. Awad, 551 F.3d 930, 938-40 (9th Cir. 2009), is particularly misplaced. As discussed above, even to the extent that dictum in that case suggests that there can be no willfulness without knowledge of illegality, not even the Ninth Circuit applies that rule to cases under § 1035. See Ajoku, 718 F.3d at 882.

## II. Materiality

Russell's next challenge concerns the materiality of his alleged misrepresentations to Dirigo on his 2008 and 2009 subsidy applications and certifications. He says there was insufficient evidence for the jury to conclude that the false statements he made were material to Dirigo's decision to award him subsidized health care because even if he was working, his income in those years would have still made him eligible for the subsidy.

We review Russell's sufficiency of the evidence challenge de novo, considering the evidence in the light most favorable to the verdict. United States v. Rios-Ortiz, 708 F.3d 310, 315 (1st Cir. 2013). We will reverse only if we find that "no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt." United States v. Symonevich, 688 F.3d 12, 23 (1st Cir. 2012) (citing United States v. Rodriquez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010)).

"[A] false statement is material if it has a 'natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" Neder v. United States, 527 U.S. 1, 16 (1999) (quoting United States v. Gaudin, 515 U.S. 506, 509 (1995)) (alteration in original). The government need not prove that the false statement actually

influenced or deceived the decisionmaker.  <u>United States</u> v. <u>Newell</u>, 658 F.3d 1, 17 (1st Cir. 2011).

The jury here could have reasonably concluded that Russell's statements had a natural tendency to influence Dirigo's decision to award him subsidized health care, and thus were material, even if Dirigo did not actually rely on those statements. At trial, the jury heard testimony from Dirigo's director that there was a limit on the income an applicant could earn in 2008 and 2009 to be eligible for an 80% health care subsidy like the one Russell was awarded.  The jury learned that Dirigo does not employ investigators to verify statements made by applicants on subsidy applications and that the agency therefore has to rely on applicants' statements in determining eligibility.  The agency requires the applicant to sign a certification to help it ensure that all the representations made by the applicant are true. Russell was awarded a $7,500 subsidy in 2008, and a $4,100 subsidy in October 2009, based on his representation in his application that he was neither employed nor receiving income.  He signed the accompanying certifications attesting to the truthfulness of his statements in those applications.

During closing arguments, defense counsel argued that Russell's statements could not have been material to Dirigo's decision because he would have qualified for a subsidy even if he had accurately reported his income.  The government, on the other

-19-

hand, urged that materiality turns on whether the false statements have a natural tendency to influence or are capable of influencing the decisionmaker.  Whether Russell's statements were material was ultimately a question for the jury.  But the record clearly supports a finding that Russell received income in the amount he reported, plus some additional sums that he did not disclose.  Had he forthrightly stated on his application that he had unspecified amounts of undocumented cash income above the precise amounts he reported, it is reasonable to believe that Dirigo might well have determined that he failed to meet his burden of proving eligibility.  As we said, the government need only prove that the false statement had a "natural tendency to influence, or [is] capable of influencing, the decision."  Neder, 527 U.S. at 16 (quoting Gaudin, 515 U.S. at 509) (alteration in original).  Given the evidence presented at trial, we believe that a rational fact finder could conclude that they were material.

Russell says that the court's rulings on the loss amount and restitution at sentencing support his argument that the false statements were not "material" to Dirigo's decision to award Russell subsidized health care and that, as a result, the jury's verdict cannot stand.  The district judge's remarks at Russell's sentencing do not change our view.  At sentencing, the judge heard counsel on the amount of loss and whether restitution should be ordered.  The judge summarized the defense's argument -- namely,

-20-

that there was no actual loss because "the false statement didn't make a difference." The defense's theory, as understood by the judge, was that even if Russell was working at the time of his alleged false statements in 2008 and 2010, there is no evidence he earned more than the amount that he would have been allowed to earn to receive subsidized coverage. And thus, "if he had told the truth, the result would have been the same."

Noting the complexity in calculating the loss amount, the judge concluded that there was insufficient evidence in the record to determine what amount Russell earned while employed by French from the fall of 2007 to June 2010. There was "no basis," in the judge's view, "to logically come to the conclusion that [Russell] made more than the amounts that would have entitled him to the subsidy . . . ." The judge then addressed the government's argument that the loss calculation should be determined by the amount in premiums (estimated by the government at $19,000) that Russell intended to take by falsely claiming he was not working on the subsidy renewal applications. In doing so, the judge said he was not "convinced, based on th[e] record, that [Russell] intended to steal premiums from the Dirigo program by falsely reporting no income." The judge was, however, convinced that Russell was working and that he was working for Malcolm French. What was perplexing for the judge was why Russell did not simply report he was working.

Because Russell's earnings could not be calculated, the judge concluded he could neither determine the loss amount nor order restitution. The judge explained that the record did not support a finding that Russell "would not have been entitled to the subsidy in any event." And, the judge added, if Russell was entitled to the subsidy, there was no "victim for whom restitution is owed."

The court's conclusion as to loss amount and restitution does not call into question the jury's finding that the false statements to Dirigo were material. In imposing the sentence, the court made clear that the verdict was "compelled by the evidence," explaining that Russell "knew he was lying when he completed th[e] forms and said he was not working." It was for the jury to determine whether Russell's misrepresentations to Dirigo were capable of influencing its decision to award him subsidized health care, even if, as defense counsel argued, his earnings at the time were so low that he still would have been eligible to receive the subsidy. As indicated by the verdict, they answered in the affirmative, and we will not disturb their conclusion.

### III. State-of-Mind Exception Under Rule 803(3)

At trial, Henderson testified that she was aware Russell completed an application with Boston Financial prior to being offered a job there. At that point, defense counsel asked her: "Was Mr. Russell worried that if he didn't put down that he was

employed by Old Stream Conservation and that he was earning money from it, that he wouldn't get the job with Boston Financial?" After Henderson responded, "Yes," the government objected on hearsay grounds. Defense counsel argued that Henderson's testimony that Russell was worried was admissible as a state-of-mind hearsay exception under Federal Rule of Evidence 803(3).

After hearing argument from counsel and voir dire of Henderson (which revealed she helped Russell complete the application), the court ruled that Henderson's testimony about Russell's worry and the reason for his worry was not admissible under the rule. Russell's statement to Henderson that he was worried, the court said, was inseparable from Russell's memory about his employment history from 2007 to 2009 when completing the form.

On appeal, Russell continues to press that Henderson's testimony about Russell's state of mind when he was completing his 2010 job application for Boston Financial is admissible under Rule 803(3). Under that rule, hearsay is admissible if it is a statement that expresses a declarant's state of mind at the time the statement is made. The rule allows, in pertinent part, any:

> statement of [a] declarant's then existing state of mind . . . such as intent, plan, motive, design, mental feeling . . . but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

-23-

Fed. R. Evid. 803(3).

To be admissible under the state-of-mind exception, the declaration, among other things, "must mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time." United States v. Rivera-Hernández, 497 F.3d 71, 81 (1st Cir. 2007) (quoting Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 212 (1st Cir. 1996)) (internal quotation marks and citations omitted). Because "disputes over whether particular statements come within the state-of-mind exception are fact-sensitive, the trial court is in the best position to resolve them." Colasanto, 100 F.3d at 212.

Russell's argument as to why Henderson's testimony should have been admissible under Rule 803(3) is confusing. On the one hand, he says that her testimony does not attempt to establish that he did not falsely claim he was unemployed on his subsidy applications; the testimony, he says, was simply to reflect his state of mind in 2010 that he listed employment with French because he was worried that if he did not, Boston Financial would see a gap in his employment history and not hire him. On the other hand, he claims that Henderson should have been able to describe his mental state in 2010 to explain the difference between his 2010 application to Boston Financial (which represented he was employed

by French) and his previous subsidy applications (which represented he was unemployed).

The district court did not err in excluding Henderson's testimony. Rule 803(3) bars the introduction of "a statement of memory or belief to prove the fact remembered or believed." Henderson was prevented from testifying as to Russell's alleged belief about his lack of recent work history and the impact it would have on a prospective employer; as Russell admits, one purpose of this testimony was to prove that Russell lacked recent work history. The court did not err in excluding this testimony.

Even if, for argument's sake, the district court had erred, any error was harmless. "Erroneous evidentiary rulings are harmless if it is highly probable that the error did not affect the outcome of the case." McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006). That requirement is satisfied here. Henderson's testimony addressed why Russell said he was French's employee on the 2010 application, when he claimed on his benefits applications that he was not -- i.e., to avoid a gap in employment which would concern a future employer. Even though Henderson's testimony on that specific point was excluded, both she and Jennifer Holgerson, a human resources representative at Boston Financial, testified about how they would perceive a substantial gap in a job applicant's employment history. Henderson, as the director of an assisted living facility who hired employees,

explained that she would view with skepticism any application that had a four-year gap in employment.  Holgerson testified that such a gap would raise "red flags" when reviewing a job application.

In his closing argument, defense counsel exploited Holgerson's testimony.  He argued that Russell said he was French's employee on his 2010 Boston Financial application because if he did not, "he'd have to deal with a four-year employment gap," which as Holgerson testified, "would raise red flags if there wasn't an adequate explanation for it."  Thus, even without Henderson's testimony addressing the reason Russell was worried when completing the job application, the jury had learned from Holgerson, as pointed out by defense counsel in his closing argument, that a potential employer would be concerned about an applicant who had a four-year gap in his employment.

## IV.  Prosecutorial Misconduct

Russell's prosecutorial misconduct claim attacks various statements made by the prosecutor in his closing and the prosecutor's alleged reference to Russell's gambling when eliciting testimony from a witness.  Because Russell raised no objection at trial, we review for plain error.  See United States v. Kasenge, 660 F.3d 537, 541 (1st Cir. 2013).  Under that standard, Russell must show that: "(1) an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or

public reputation of [the] proceedings." Id. at 542 (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). We will reverse only if, in light of the entire record, the challenged prosecutorial conduct "so poisoned the well that the trial's outcome was likely affected." United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003) (quoting United States v. Sepulveda, 15 F.3d 1161, 1188 (1st Cir. 1993)). To make that assessment, we consider: "'(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants.'" Kasenge, 660 F.3d at 542 (quoting United States v. Nelson-Rodriquez, 319 F.3d 12, 38 (1st Cir. 2003)). With this standard in mind, we turn first to the specific statements made by the prosecutor at closing that Russell claims require reversal.

### A. The Prosecutor's Closing Argument

### 1. Alleged Reference to Russell's Failure to Testify

Russell first contends that the prosecutor improperly commented on his failure to testify by arguing: (1) "[w]hy do you suppose the defendant would not want his name listed as treasurer" of Old Stream Conservation during a time when he was telling Dirigo that he was unemployed and had no income; (2) that the jury would "know from his own job application that the defendant was being

paid by Old Stream between 2007 and 2009, but there was not a single paycheck deposited into the defendant's bank account during that period of time"; and (3) that "[t]here's no indication in [the call log] that Mr. Russell called up Dirigo Health and said, whoa, wait a minute, what am I getting these benefits for?" Russell recites these statements, but he fails to explain why they constitute improper commentary.

In assessing whether a prosecutor has improperly commented on a defendant's exercise of his Fifth Amendment rights against self-incrimination, we typically look to "whether the prosecutor's language shows a manifest intention to comment on the defendant's failure to testify and whether the jury would naturally and necessarily understand it to be a comment on the defendant's failure to testify." United States v. Barbour, 393 F.3d 82, 90 (1st Cir. 2004) (citing United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996)). In doing so, we neither "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning" nor do "we assume the jury will draw from the comments the most damaging meaning." Id. at 91.

In this case, however, Russell's argument that the prosecutor's statements improperly commented on his failure to testify is undeveloped and unsupported by any reference to legal authority. It is therefore waived. See Cruz v. Bristol-Myers Squibb Co., PR, Inc., 699 F.3d 563, 572 (1st Cir. 2012). The

prosecutor's statements cannot plausibly be construed as comments on Russell's failure to testify. But even if the comments were improper (and, again, we do not see how they were), they did not likely affect the outcome of the trial. See Henderson, 320 F.3d at 107. The comments were made once and not elaborated upon, and defense counsel did not timely object to the comments, which, as our case law suggests, makes it less likely the remarks infected the jury. See United States v. Shoup, 476 F.3d 38, 44 (1st Cir. 2007); United States v. Procopio, 88 F.3d 21, 31 (1st Cir. 1996).

Any potential influence on the jury was mitigated by the jury instructions, which repeated the government's beyond-a-reasonable-doubt burden, and stated that the defendant had no obligation to testify, and that the jury should draw no inference from his choice. In both his preliminary and final jury instructions, the judge instructed the jury that the lawyer's comments and closing arguments were not evidence, and that it was to decide the facts from the evidence presented. We assume the jury followed these instructions. See Morales-Vallelanes v. Potter, 605 F.3d 27, 34-35 (1st Cir. 2010). Finally, the evidence of Russell's guilt was strong, including the renewal subsidy applications indicating Russell was not employed or receiving any income and the witnesses who testified that Russell was seen working in some capacity for French during that time.

Thus, the prosecutor's comments were not significant enough to affect Russell's rights or seriously impair his trial.

### 2.   The Conspiracy Theory Related Comments

Russell next argues that the prosecutor made multiple comments which, taken together, improperly insinuated that Barbara French, Malcolm French, French's employees, Russell, and others conspired to hide damaging evidence (that Russell was working and being paid under the table) from the government.  The prosecutor's closing did not explicitly argue that such a conspiracy existed.  Russell nonetheless claims that the comments alluded to one, and that because the evidence presented at trial did not support a conspiracy theory, the comments somehow amounted to prosecutorial misconduct.

### a.   Malcolm French and Barbara French

We start with Russell's argument that the prosecutor improperly commented on the Frenches' "failure to testify," alluding to a conspiracy between the Frenches and Russell.[10]  During his closing argument, the prosecutor said:

> Now, Boston Financial has somebody check his references.  You heard Ms. Holgerson explain the practice and procedure that Boston Financial follows every single time somebody

---

[10]Russell says that by attributing certain statements to the Frenches and drawing the image of a conspiracy between them and Russell, the prosecutor commented on the Frenches' failure to testify.  Because there are no Fifth Amendment implications here, we do not see how the prosecutor's comments could have been improperly referencing the Frenches' failure to testify.

> applies for a job. Mr. Russell knew that they were going to check his references. He signed a release authorizing Boston Financial to contact his references . . . . He provided Malcolm French's name and telephone number, and you know from Ms. Holgerson that it is Boston Financial's practice to check the references before hiring and that they followed that practice in this case.

The prosecutor then went on to make the following statement:

> Ms. Holgerson [from Boston Financial]. . . told you . . . that if she had received information contrary to what was disclosed in the application, she would have questioned Mr. Russell about it. She also told you she never did because she never had to . . . . It is fair for you to infer from that evidence and from Ms. Holgerson's testimony that Malcolm French confirmed that the defendant worked for Old Stream Conservation between 2007 and 2009.

Russell argues this latter comment was improper for two reasons. First, he claims Holgerson never said any of this. Second, he says that because Malcolm French is the only one who could have confirmed whether Russell worked for him, asking the jury to infer from Holgerson's testimony that French confirmed Russell's employment amounted to improper comment on French's failure to testify. A look at both the prosecutor's statements and Holgerson's testimony at trial show that the prosecutor's description of Holgerson's testimony was accurate.

Holgerson testified that a third-party vendor, Sterling Financial ("Sterling"), conducts background checks on all Boston Financial applicants. The background check includes an employment reference check. Holgerson explained that if Boston Financial

-31-

cannot confirm a candidate's employment history, it will "reach back out to the candidate and do some research with them, ask for proof of employment or an explanation." And if it cannot confirm that somebody worked where they said they worked, the discrepancy would be brought to her attention. Holgerson said that it is her practice to follow up on such information and that she would not ignore that type of information and extend a candidate an offer.

When it came to Russell's application, Boston Financial, according to Holgerson, followed the same hiring process. She was personally involved in that process; she reviewed Russell's resume, conducted his phone screening interview, scheduled him to interview with a manager, and extended him an offer. Holgerson testified that Sterling ran a background check on Russell (which included the employment reference check) and that she never heard from Sterling that there was a problem with Russell's background check.

In light of Holgerson's testimony, we see no error in the prosecutor's statements that Holgerson said she would have known if the employment reference check on Russell revealed any discrepancies. The prosecutor's statement that Holgerson would have questioned Russell about it was just another way of summarizing Holgerson's testimony that she would have followed up on this type of information. Stating that it was fair for the jury to infer from Holgerson's testimony that Malcolm French confirmed Russell's employment with French in connection with the job

application to Boston Financial had nothing to do with French's failure to testify. The inference that French confirmed Russell's employment with him can be drawn from Holgerson's testimony about Boston Financial's hiring process as it applied to Russell.

Moving on to Russell's challenge to the prosecutor's comments about Barbara French, Russell takes issue with the prosecutor's statement that she "conveniently failed to send in the monthly Cold Stream Contracting general ledger" for January, February, and March 2007. We see no impropriety. The prosecutor was "entitled to draw the jury's attention to the balance of evidence on contested issues." United States v. Stroman, 500 F.3d 61, 65 (1st Cir. 2007). The Frenches' accountant, Gail Davis, testified that Barbara French did not send her the general ledger (which Barbara French managed) for January, February, March, or April 2007. Even though the government focused Davis on whether or not she was sent those ledgers (regardless of the reason), Davis testified that Barbara's operating system had crashed because she had been using an outdated operating system which in turn prevented her from sending the ledgers (corresponding to January, February, and March 2007).

Davis further testified that the newer operating system generated checks the same way the older system did. When shown a copy of a check from Cold Stream Contracting to Griffin Greenhouse dated March 16, 2007, Davis confirmed that the date of the check

indicates it would have been generated even under the older operating system. And when asked whether she would know about such cash transactions, Davis testified that she would only know about them if the Frenches spoke to her about them or if those transactions were documented on the ledger. It was up to the jury to decide whether Barbara French did not send Davis the ledgers for January, February, and March 2007 (given the evidence of the check to Griffin Greenhouse) because there were transactions she did not want Davis to know about or whether the ledgers were not delivered to Davis due to an operational system malfunction (given Davis's testimony on that point). The prosecutor's remark merely attempted to urge the jury to draw the reasonable inference that Barbara French intentionally failed to send Davis the ledgers in light of the evidence that Cold Stream made check payments that were neither noted on the ledger nor shared with Davis.

### b. Testimony of French's Accountant

We find no merit in Russell's additional claim that the prosecutor's remarks overstated Davis's testimony. In arguing that the evidence established that Russell was being paid in cash by French in 2007, 2008, and 2009, the prosecutor said:

> The evidence establishes that Cold Stream was dealing in cash at Griffin Greenhouse. Old Stream has cash being deposited into its account. We know that none of this cash is going through their books and records; Malcolm's paid accountant told you that and established that for you. She told you that if Malcolm was paying expenses in cash and not withdrawing the cash

> from the bank account and not telling her about
> it, she would have no reason to know about it
> . . . .

The prosecutor's summary was a fair representation of the accountant's testimony. When asked about cash withdrawals from the Cold Stream account, Davis testified that there was only one cash withdrawal in the three-year period (from 2007 to 2009) for $200 or $500 to make a cash payment to an oil company. According to Davis, if Cold Stream had told her it "kept cash on-hand," she "would know about it." Davis also said that if Cold Stream had any cash on-hand, it would have to be reported on its tax returns; she did not know of any cash on-hand listed on Cold Stream's tax returns.

### 3. "Bagman"

Russell next takes issue with the prosecutor's statement that "[t]he defendant acting as the bagman dropping off bags of cash . . . [t]his is how Mr. [Jerald] Davis remembered Mr. Russell." Russell says that in addition to the fact that Davis did not use the term "bagman," the term bagman conjures up an impermissible unsavory connotation that warrants a new trial. We disagree. The prosecutor's comments referring to Davis's testimony that he remembered Russell dropping off bags of cash was consistent with Davis's testimony. Davis testified that Russell paid $9,000 to $11,000 in cash for truckloads of soil and multiple bags of fertilizer from Griffin Greenhouse. Davis said Russell brought in the cash in a Ziploc bag on more than one occasion. When asked

what stood out the most in Davis's mind about Russell, Davis said, "The cash."

We find nothing inappropriate about using the word "bagman" to describe Russell, when Davis in fact testified that Russell purchased materials from Griffin Greenhouse with cash stuffed in Ziploc bags. Because the prosecutor's comments reflected a fair interpretation of Davis's testimony, they did not constitute prosecutorial misconduct.[11]

### B. The Prosecutor's References to Gambling

Russell makes one last claim of misconduct based on the prosecutor's cross-examination of Russell's friend, George Hartmann. The prosecutor asked Hartmann about the last time he had seen Russell. Hartmann responded that he had dinner with Russell

---

[11]We also reject Russell's cursory argument that the prosecutor attempted to rope in to the conspiracy Henderson (Russell's wife) and French's employees by misusing their grand jury testimony. Russell says the prosecutor improperly began his cross-examination of Henderson by asking her if she remembered her grand jury testimony, instead of first asking her a question which might have revealed she needed her memory refreshed with her grand jury testimony. Russell further claims the prosecutor's imaginary conspiracy theory was apparent by his statements in closing about the differences between the grand jury testimony of Fogg, Benson, and Webber (all French employees), and their testimony at trial. Russell's reply argues that misusing the grand jury testimony in this way was a deliberate attempt to mischaracterize witness testimony. Russell neither presents any developed analysis nor references any relevant case law to support his claims. We decline to address such undeveloped arguments. See Colón v. R.K. Grace & Co., 358 F.3d 1, 5-6 (1st Cir. 2003) ("It is not this court's role to assemble a coherent argument for one side merely because evidentiary pieces are mentioned somewhere among the factual recitations and the topic sentence of the argument is supplied in the argument section of the brief.").

the previous evening at "Hollywood Slots." Russell says this testimony amounted to an impermissible reference to gambling. The prosecutor's line of questioning had nothing to do with gambling. The questions focused on what Hartmann and Russell discussed at dinner, who else was there, what Hartmann and defense counsel discussed the night before, and other matters unrelated to gambling. The other instances in which Russell says the prosecutor improperly raised the gambling issue (after the court had told him that introducing a gambling issue into the case may be prejudicial) occurred outside of the jury's presence -- namely, at side bar during the testimony of Russell's first wife, after voir dire of his current wife, Henderson, and at the end of the second day of trial. Russell points to no other time during which the jury heard any testimony by witnesses about Russell's gambling.

In sum, neither the prosecutor's statements during closing arguments nor his questions in eliciting testimony from Hartmann necessitate reversal.

## CONCLUSION

For the aforementioned reasons, we affirm the judgment below.