**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Galen G. KELLY, Defendant–Appellant.**

No. 93–5838.

United States Court of Appeals,
Fourth Circuit.

Argued July 19, 1994.

Decided Sept. 16, 1994.

---

**ARGUED:** Frank Willard Dunham, Jr., Cohen, Gettings, Dunham & Harrison, P.C., Arlington, VA, for appellant. Lawrence Joseph Leiser, Asst. U.S. Atty., Office of the U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Stewart T. Leeth, Cohen, Gettings, Dunham & Harrison, P.C., Arlington, VA, for appellant. Helen F. Fahey, U.S. Atty., Office of the U.S. Atty., Alexandria, VA, for appellee.

Before WILKINS and LUTTIG, Circuit Judges, and TRAXLER, United States District Judge for the District of South Carolina, sitting by designation.

Reversed by published opinion. Judge ·WILKINS wrote the opinion, in which Judge LUTTIG and Judge TRAXLER joined.

## OPINION

WILKINS, Circuit Judge:

Galen G. Kelly appeals his kidnapping conviction, *see* 18 U.S.C.A. § 1201(a) (West 1984 & Supp.1994), principally asserting that he is entitled to a new trial because Debra Dobkowski—the alleged victim and primary Gov-

ernment witness—perjured herself and because the Government failed to comply with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the Jencks Act, 18 U.S.C.A. § 3500 (West 1985), by not disclosing material that would have permitted him to impeach Dobkowski's credibility. We agree that Kelly was deprived of a fair trial. Accordingly, we vacate his conviction and remand for further proceedings.

## I.

Kelly was a "professional deprogrammer" who assisted parents and others in retrieving loved ones from cults and in deprogramming them. He had been a vocal critic of a cult known as the Circle of Friends and had assisted in the prosecution of its leader, George Jurcsek. As a result, members of the Circle of Friends considered Kelly an enemy of the cult.

During the spring of 1992, Mrs. Donna Bruckert retained Kelly to extricate her 43-year-old daughter, Beth Bruckert, from the Circle of Friends. Assisted by a surveillance team, Kelly learned where Beth was residing in Washington, D.C. with two other women, one of whom was Dobkowski. He also learned where Beth and Dobkowski were working as security guards and what type of automobile Beth drove.

On May 5, 1992, Kelly and a team of three other individuals went to the Octagon House in Washington, D.C. where Beth was stationed as a security guard and waited for her to leave at the end of her shift. A few minutes before midnight, Kelly observed a woman matching Beth's description leave the Octagon House and approach Beth's automobile. Although Kelly and his associates believed this woman to be Beth, in fact the woman was Dobkowski. Kelly and Dobkowski presented sharply conflicting versions of the events that followed. Kelly asserted that Dobkowski voluntarily accompanied him to Virginia after he requested that she go with him to visit Mrs. Bruckert. Dobkowski claimed that Kelly forcibly took her to Virginia against her will.

Kelly was indicted by a grand jury in March 1993 on a charge of kidnapping Dobkowski in violation of 18 U.S.C.A. § 1201(a).[1] In the meantime, the Internal Revenue Service (IRS) had begun an independent investigation of Dobkowski. The IRS believed that Dobkowski and others, including Beth, were involved in a conspiracy with other members of the Circle of Friends to structure financial transactions to avoid the reporting requirements for certain currency transactions, *see* 31 U.S.C.A. § 5324(a)(3) (West Supp.1994), with possible implications in money laundering and other criminal activity. On Thursday, May 20, 1993—four days before Kelly's trial was scheduled to begin—the IRS executed a search warrant for Dobkowski's residence. In applying for the search warrant, the Government submitted a detailed affidavit recounting the facts it possessed indicating Dobkowski's involvement in the conspiracy, including information concerning her involvement in the Circle of Friends and the various illegal acts she was alleged to have committed. That evening, the Government faxed a two-page letter to Kelly's counsel. The letter informed defense counsel of some, but not all, of the information in the search warrant affidavit, disclosing Dobkowski's deposits and withdrawals at various financial institutions; her failure to comply with notification of outside employment requirements imposed by her employer, the Environmental Protection Agency (EPA); and her involvement in submitting a fraudulent mortgage loan application to purchase property in North Carolina. The letter, however, did not refer to the affidavit or the search of Dobkowski's residence.

The following day, Friday, May 21st, the Assistant United States Attorney in charge of the Kelly prosecution examined the evidence seized during the search of Dobkowski's residence to determine whether it contained *Brady* and Jencks Act material that would have to be disclosed to Kelly. As a

---

1. The Government did not immediately seek to prosecute Kelly, purportedly because he was under investigation for conspiring to kidnap and deprogram another individual from a different organization in Virginia. In December 1992, Kelly was acquitted in the United States District Court for the Eastern District of Virginia on charges brought following the investigation. Thereafter, the Government sought to prosecute Kelly for the Dobkowski incident.

result, the Government provided approximately 85 pages of material to defense counsel, delivering this evidence on Sunday evening, the eve of trial. The material consisted primarily of notes that Dobkowski, a prolific writer, had made concerning her meetings with the prosecution team, her prior statements concerning the facts of the kidnapping, and some "letters" addressed to "Susan/George" or "George" concerning how she should respond to various questions or issues presented by Kelly's upcoming trial.

Trial commenced as scheduled. Dobkowski, the first witness for the Government, testified that she attended Oberlin College as an undergraduate and received a masters degree from Harvard University, that she was employed as a GS–15 branch chief manager in the policy office of the EPA, and that she also worked on various security guard jobs.

Dobkowski further testified that the events of the night of May 5, 1992 occurred as follows. As she left the building, she was approached by two men wearing camouflage clothing who threw her against the hood of Beth's automobile while she struggled and screamed. The men physically placed her in a nearby van and transported her to a hotel in Virginia. During the trip, one of the men who had approached her identified himself as Kelly and threatened her with injury if she did not cooperate. Upon their arrival in Virginia, Mrs. Bruckert appeared at the van and informed Kelly that Dobkowski was not her daughter Beth. Kelly and the others then returned Dobkowski to Beth's automobile and pushed her out of the van.

Dobkowski realized that she had left her thermos in the van and asked for its return.[2] One of the individuals in the van threw the thermos to her.[3]

The Government then questioned Dobkowski concerning her application in 1990 for a mortgage to purchase property in North Carolina. Dobkowski testified that although some of the material information on the mortgage application form was inaccurate,

she did not know who had placed the incorrect information on the document, did not learn that the information contained on the application form was inaccurate until closing, and then simply made an error in judgment by signing the document anyway.

During cross-examination, defense counsel questioned Dobkowski concerning the Circle of Friends. Dobkowski admitted that she knew that George Jurcsek was the purported leader of the Circle of Friends and that she had met him on approximately a dozen occasions over the seven or eight years that she had known him, but she denied that she or her roommates were ever members of the Circle of Friends. Indeed, she testified that she knew nothing about the Circle of Friends and did not know what defense counsel was referring to when he used the term. When defense counsel presented Dobkowski with documents seized during the search of her residence, which were authored by her in the form of letters to "Susan/George" or simply "George," Dobkowski denied that these documents were actually letters to George Jurcsek. Rather, Dobkowski maintained that she wrote these letters as a means of processing her internal thoughts. Despite the wealth of information available to the Government indicating that Dobkowski and her roommates were in fact members of a cult known as the Circle of Friends and that Dobkowski was in frequent contact with Jurcsek, the Government sat silently through this testimony, except to object periodically to the relevance of the questions.

Kelly's version of the events of the night of May 5, 1992 was very different. He testified that the two female members of his team approached a woman they believed was Beth as she exited the Octagon House and neared Beth's automobile. They greeted the woman, calling her Beth, and the woman responded to that name. Kelly then confronted the woman, believing her to be Beth, and explained that her father, referring to Mr. Bruckert, had died and that her mother, referring to Mrs. Bruckert, was very ill and

---

**2.** Dobkowski testified that despite her struggle with the men, she had retained a thermos, a bag of food, and her daytimer, which she took with her in the van.

**3.** Law enforcement authorities subsequently discovered Kelly's fingerprint on the thermos.

wished to see her. He asked the woman to accompany him to meet with her mother, and she willingly agreed to do so. During the ride to Virginia, Kelly conversed with the woman about their opposing beliefs concerning the Circle of Friends and its leader George Jurcsek, attempting to establish a rapport that could form the basis for deprogramming. Kelly noticed that the woman was behaving somewhat differently than expected based on his experience in conducting this type of intervention. After they arrived in Virginia and rendezvoused with Mrs. Bruckert, she informed them that the woman was not her daughter. At this point, Dobkowski told Kelly that she intended to report the incident as a kidnapping, that Kelly had been "neutralized," and that he would be unable to cause further trouble for the cult. Kelly immediately returned Dobkowski to the Octagon House.

Kelly's defense was that Dobkowski had intentionally pretended to be Beth and had accompanied him to Virginia in order to frame him by fabricating a kidnapping, thereby discrediting him and obtaining retribution for Kelly's participation in Jurcsek's prosecution. To prove his defense, Kelly sought to demonstrate that Beth and Dobkowski must have learned that he had been retained to extricate Beth from the cult through his prior contacts with Beth's employer and that Dobkowski had switched shifts with Beth on May 5th, had cut her hair to resemble Beth's, had driven Beth's automobile to work rather than her own, and had responded to the name Beth when she was approached in order to make him believe that she was Beth. Kelly also attempted to show that because of his outspoken criticism of the Circle of Friends and his involvement in the prosecution of Jurcsek, Kelly was well known to cult members, was considered to be an enemy of the cult, and was known as such to Dobkowski, who was the leader of the Washington, D.C. membership of the cult and was in close and frequent contact with Jurcsek.

Following his conviction, Kelly moved for a new trial on the basis that the Government had failed to produce various documents to which he was entitled under *Brady* and the Jencks Act. Kelly complained that the Government had not provided the affidavit submitted in support of the request for the search warrant for Dobkowski's residence; three pertinent pages of Dobkowski's daytimer; a letter authored by Dobkowski dated September 14, 1992 bearing the salutation "George"; and a maroon diary.[4] In addition, Kelly claimed that a new trial was warranted because Dobkowski had lied during her trial testimony and the Government had permitted her to do so. The district court denied Kelly's motion for a new trial, concluding that the Government either was not required to produce the material or that Kelly was not prejudiced by its failure to do so. The district court did not directly address the question of whether Dobkowski lied during her trial testimony.

## II.

■ A conviction acquired through the knowing use of perjured testimony by the Government violates due process. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). This is true regardless of whether the Government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972). Even if the false testimony relates only to the credibility of a Government witness and other evidence has called that witness' credibility into question, a conviction must be reversed when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397; *accord Napue*, 360 U.S. at 269–70, 79 S.Ct. at 1177. This is so because "[t]he

---

4. During the presentence investigation following Kelly's conviction, a United States Probation Officer reviewed the evidence seized during the search of Dobkowski's residence and discovered documents that she believed bore on Dobkowski's credibility—including the three pages from Dobkowski's daytimer, the September 14, 1992 letter, and the maroon diary—and brought them to the attention of the district court. The district court then disclosed the existence of this material to defense counsel.

jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177.

The Government's case rested primarily on Dobkowski's testimony, and thus unquestionably, her testimony was essential to Kelly's conviction. Without Dobkowski's testimony it is questionable whether sufficient evidence would have existed to take the Government's case before the jury given the lack of other evidence tending to show that Dobkowski was transported across a state line without her consent. *See United States v. Childress*, 26 F.3d 498, 501–02 (4th Cir.1994). If the jury believed Dobkowski, it would convict, while if it disbelieved her, it would acquit.[5] Moreover, Kelly's defense centered on Dobkowski's involvement with the Circle of Friends and with Jurcsek, so her testimony that she was not a member of this group and was not in frequent communication with Jurcsek prevented Kelly from establishing the basis from which his defense could proceed. Accordingly, Dobkowski's credibility and any reasons she may have had to falsify her testimony concerning the events of May 5th, particularly her involvement with the Circle of Friends and with Jurcsek, were critical to the jury's resolution of Kelly's guilt.

Kelly asserts that Dobkowski perjured herself in a number of respects and that the Government was aware that she was doing so. First, Kelly points to Dobkowski's testimony concerning her involvement with the fraudulent mortgage loan application in North Carolina. Dobkowski testified that she did not place the fraudulent information

on the form, did not know who had done so, and did not learn that the application form contained false information until the loan closing. The clear import of her testimony was that her criminal involvement in the matter was limited to signing a document that she recognized contained false information. The affidavit submitted by an IRS agent in applying for a warrant to search Dobkowski's residence provided, "A review of the mortgage application completed and filed by Dobkowski reveals that she falsified the employment and income information." In addition, the affidavit explained that "Dobkowski also provided the lender with a form entitled 'Statement of Earnings and Leave' purportedly from Environmental Economics, Inc.," but other information in the affidavit indicated that there was no such business entity and that Dobkowski had earned no income from the company. Further, the Government's letter of May 20th advising Kelly of some of the information contained in the search warrant affidavit stated, "In her mortgage application [Dobkowski] indicated" false employment information and "listed" false income information. Moreover, the Government subsequently sought and obtained from a grand jury[6] an indictment of Dobkowski—and others including Beth and Jurcsek—for conspiracy to commit offenses against the United States, *see* 18 U.S.C.A. § 371 (West 1966), and the substantive offenses of wire fraud, *see* 18 U.S.C.A. § 1343 (West Supp.1994), bank fraud, *see* 18 U.S.C.A. § 1344 (West Supp. 1994), mail fraud, *see* 18 U.S.C.A. § 1341 (West Supp.1994), and structuring currency transactions to avoid reporting requirements, *see* 31 U.S.C.A. §§ 5322, 5324(a)(3) (West Supp.1994). The conspiracy count alleged that Dobkowski acted in furtherance of the

---

5. In addition to Dobkowski's testimony, the Government offered evidence concerning Kelly's fingerprint on Dobkowski's thermos, testimony of the officer to whom Dobkowski reported the incident the following morning, and surreptitiously recorded conversations between Kelly and another individual. Neither the evidence of Kelly's fingerprint on the thermos nor the officer's testimony concerning Dobkowski's report of the incident were inconsistent with Kelly's version of the events of May 5th. And, although Kelly's statements during the recorded conversations—including his references to having "grabbed" or

"snatched" Dobkowski—can be viewed as implicating him in a nonconsensual encounter with Dobkowski, they do not provide overwhelming evidence of his guilt as the Government suggests.

6. Indictment of Dobkowski was obtained in the United States District Court for the Eastern District of Virginia. The Assistant United States Attorney in charge of the Dobkowski prosecution is a member of the same United States Attorney's Office responsible for the Kelly prosecution.

conspiracy by submitting false information in connection with the North Carolina mortgage loan application, including false employment and income information, a fraudulent document purported by Dobkowski to be a photocopy of a canceled check for her down payment on the property, and a fabricated earnings statement. In addition, Dobkowski's presentence report stated that Dobkowski "filled out a fraudulent loan application in order to secure a mortgage on [the North Carolina] property." Second, Kelly asserts that Dobkowski repeatedly lied during her cross-examination concerning her relationship and contacts with Jurcsek, including her testimony that she and Jurcsek were merely casual business acquaintances and that she was not in frequent contact with him. As one example of her perjury on this subject, Kelly points to Dobkowski's testimony that the numerous documents addressed to "George" were merely correspondence with her higher self. During the sentencing investigation undertaken following Dobkowski's conviction, she repeated these assertions to a United States Probation Officer, apparently in an attempt to protect Jurcsek from implication in the conspiracy. The Government took the position that these assertions constituted "bizarre" lies.

Finally, and perhaps most fundamentally, Kelly complains that Dobkowski's testimony that she was not a member of the Circle of Friends and did not know anything about that organization was false. Dobkowski's presentence report related that "[d]uring the course of the Government's investigation [it] uncovered information suggesting that [Dobkowski], as well as [Beth] Bruckert ... were members of the religious cult referred to as the Circle of Friends." And, during the sentencing colloquy, the Government affirmed its position that the statement in the presentence report concerning Dobkowski's membership in the Circle of Friends was accurate.[7]

Were we given the task, we would not hesitate to find that the record before this court demonstrates overwhelmingly that Dobkowski's testimony was false in numerous respects and that the Government at least should have known that it was false. However, the Supreme Court has made plain that an appellate court is not the appropriate forum for a resolution in the first instance of whether a Government witness perjured herself during her trial testimony or whether the Government knew or should have known of the perjury. *DeMarco v. United States,* 415 U.S. 449, 449–50, 94 S.Ct. 1185, 1185–86, 39 L.Ed.2d 501 (1974) (per curiam).[8] While Kelly argued before the district court that Dobkowski had perjured herself, the court failed to resolve this factual question. Thus, were this the only alleged error that might warrant reversal of Kelly's conviction, we would be required to remand for the district court to resolve this disputed factual matter.[9] *See id.* However, it is not, and we turn to

7. Additionally, the Assistant United States Attorney who tried this case and argued the appeal for the Government represented to this court during oral argument that he believed that Dobkowski was a member of an association known as the Circle of Friends, but that the members of the organization did not call themselves the Circle of Friends. Although the Assistant United States Attorney admitted that Dobkowski knew those outside her organization referred to it as the Circle of Friends, he opined that Dobkowski had been playing a clever semantic game with defense counsel by denying membership in the Circle of Friends.

8. In *DeMarco,* a habeas petitioner appealed the denial of the writ by the district court and raised for the first time a claim that a Government witness had perjured himself during his trial testimony. The petitioner asserted that statements made by a United States Attorney during the witness' sentencing hearing evinced that the witness' trial testimony—that promises had not been made to him concerning the disposition of charges then pending against him—was false and that the Government knew the testimony to be false. After examining the transcript of the sentencing proceeding, the Court of Appeals concluded that no promise had been made to the witness and accordingly that the witness' testimony had not been false. The Supreme Court vacated the decision of the Court of Appeals and remanded with instructions that the case be remanded for further proceedings before the district court, reasoning that the dispositive question of whether a promise had been made to the witness prior to his testimony was a factual one and should have been decided by the district court after an evidentiary hearing.

9. The Government conceded during oral argument that the question of Dobkowski's perjury should have been resolved below.

consider Kelly's allegations concerning the failure of the Government to provide him with various evidence under *Brady* or the Jencks Act.

### III.

■ Suppression of exculpatory evidence by the Government that is material to the outcome of a trial violates due process, irrespective of the motivation of the prosecutor. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). In addition to the disclosure of exculpatory evidence, due process requires the Government to disclose material evidence affecting the credibility of Government witnesses. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Evidence is material when "its suppression undermines confidence in the outcome of the trial"—that is when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 678, 682, 105 S.Ct. 3375, 3381, 3383–84, 87 L.Ed.2d 481 (1985).[10] A reviewing court considers the totality of circumstances in assessing the possibility of a different outcome. *Id.* at 683, 105 S.Ct. at 3384.

Kelly asserts that the Government failed to provide him with a number of different documents that should have been disclosed under *Brady,* the Jencks Act, or both, and that its failure to do so warrants reversal. Specifically, Kelly asserts that the Government should have produced the search warrant affidavit; the letter dated September 14, 1992; three pages from Dobkowski's daytimer dated May 7, 9, and 10, 1992; and the maroon diary.

### A.

Kelly argues that the affidavit submitted in support of the application for a warrant to

search Dobkowski's residence contained considerable information that could have been used to impeach Dobkowski and that was not set forth in the Government's letter of May 20th. With respect to Dobkowski's structuring of currency transactions to evade reporting requirements, the Government's letter disclosed that she and others had opened checking accounts and made various deposits and withdrawals on certain days. It also noted that all of the deposits were for amounts less than $10,000; however, it did not indicate that some of the deposits were made in cash or that the conduct outlined violated federal law. The affidavit, on the other hand, enumerated Dobkowski's activities related to the structuring transactions, noting that some of the transactions were in cash, that Dobkowski was observed carrying large sums of cash, and that analysis of the coconspirators' federal income tax returns and necessary living expenses disclosed that the income from known sources was insufficient to support the level of banking and commodities trading in which the women engaged.

With respect to Dobkowski's employment, the letter informed Kelly that despite EPA requirements for notification of outside employment, Dobkowski worked as a security guard without notifying the EPA and that on application forms for security guard positions, Dobkowski failed to disclose her employment with EPA or her educational background. It did not, as the search warrant affidavit did, reveal that Dobkowski had been on continuous paid sick leave from the EPA since August 1992, approximately nine months, and that during this period she had been working numerous security guard jobs.

Finally, the letter made no mention of Dobkowski's affiliation with the Circle of Friends or her association with Jurcsek. In

---

10. The parties have not addressed, and we therefore do not consider, whether the standard of materiality may be a lesser standard when the evidence demonstrates that a Government witness presented false trial testimony. *See Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397 (stating that when "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have

known, of the perjury," the standard for materiality is whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury"); *Bagley,* 473 U.S. at 678–80, 105 S.Ct. at 3381–83 (noting that the standard *Agurs* employed when Government knowingly uses perjured testimony also applies when the Government fails to disclose information demonstrating that the testimony was false).

contrast, the search warrant affidavit described Dobkowski's association with the Circle of Friends and her connection with Jurcsek. The affidavit stated, in pertinent part, that Dobkowski and her roommates were members of a cult known as the Circle of Friends and headed by Jurcsek, that Dobkowski was the leader of the Washington, D.C. branch of the group, and that Dobkowski was in frequent communication and correspondence with Jurcsek and other leaders of the Circle of Friends.

■ In arguing that there was no *Brady* violation, the Government first asserts that it had no duty to produce the affidavit because defense counsel could have obtained the affidavit from other sources through the exercise of reasonable diligence. In *United States v. Wilson,* 901 F.2d 378, 380 (4th Cir.1990), this court held that " 'the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources' "; thus, when defense counsel could have discovered the evidence through reasonable diligence, there is no *Brady* violation if the Government fails to produce it. *Id.* (quoting *United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 184, 93 L.Ed.2d 118 (1986)). The Government maintains that the search warrant affidavit was not under seal, and therefore, no *Brady* violation occurred because defense counsel could have obtained it. However, the record before this court simply does not bear out this assertion. It is undisputed that defense counsel did not learn of the search of Dobkowski's residence until the Sunday before the trial began on Monday morning, and Dobkowski was the first Government witness. Moreover, the search warrant affidavit was not filed, and therefore not available for public access, until May 26, 1993—the day on which Kelly rested his defense. Thus, we cannot say that defense counsel could have obtained the affidavit or all of the pertinent information disclosed therein through reasonable diligence from sources other than the Government in time to have used it to impeach Dobkowski.

The Government also contends that it did not violate *Brady* because it disclosed much of the information contained in the search warrant affidavit in its letter of May 20th and Kelly was already aware of some of the remaining information. Our comparison of the search warrant affidavit and the May 20th letter sent by the Government, however, compels us to conclude that the letter does not begin to set forth adequately all of the information contained in the affidavit that could have been used to impeach Dobkowski. The information disclosed concerning Dobkowski's involvement in the structuring transactions and her application for the mortgage loan in North Carolina fell woefully short of the information contained in the affidavit. Further, the letter completely failed to divulge information concerning Dobkowski's extended sick leave from EPA, during which she was working numerous other jobs. And, while the Government is correct that Kelly was already aware of the information contained in the affidavit concerning Dobkowski's involvement with the Circle of Friends and Jurcsek, Kelly clearly was not aware that the Government apparently shared his belief concerning her involvement.

■ In our view, the extremely damaging information contained in the affidavit leads to the inescapable conclusion that a reasonable probability exists that the result of the trial would have been different had the Government disclosed the affidavit to Kelly. Certainly, our confidence in the outcome of the trial is undermined by the information contained therein. The evidence against Kelly was far from overwhelming; indeed, as noted above, the question of guilt or innocence essentially involved a credibility determination between Kelly and Dobkowski. Under these circumstances, evidence that seriously undermined Dobkowski's credibility must be considered material.

## B.

■ Further, were we not convinced that the Government's failure to disclose the affidavit submitted in support of its application for a warrant to search Dobkowski's residence constituted a *Brady* violation, we would find reversible error in the Government's failure to produce the letter dated September 14, 1992, written by Dobkowski to "George," describing a morning she returned

to EPA after an extended absence on paid sick leave. After reviewing her activities during the morning, she wrote:

> At this point, I really was quite tired from having faked being tired all morning. In all the interactions, I slouched in my chair, propped my head up with my hand, etc. When I left the house, I had put powder on my face to look more washed out and wore a color dress that also makes me look washed out.

Dobkowski went on to seek George's reaction to her day, suggesting that she continue the ruse and extend the period of feigned illness for another 12–14 weeks of sick leave.

Even if the Government were correct that it was not required under the Jencks Act to produce the September 14, 1992 letter,[11] the letter still provides information that could have been used to attack Dobkowski's credibility. Indeed, in our view Dobkowski's admission that she had gone to such lengths to feign illness to her employer would have been potentially devastating to Dobkowski's credibility. This evidence, in combination with the evidence that Dobkowski had been on paid sick leave from EPA for approximately nine months and that during this period Dobkowski had been working in other capacities, would have permitted Kelly to argue that Dobkowski was not the respectable, Harvard-educated, high-ranking, federal employee presented by the Government, but was a malingerer who had defrauded not only her employer but the co-workers who donated their sick leave so that her paid leave could be extended. Therefore, for essentially the same reasons set forth above with respect to the search warrant affidavit, we conclude that the September 14, 1992 letter was material and that the Government should have provided it to defense counsel under *Brady*.[12]

## IV.

Because we conclude that the failure of the Government to supply Kelly with the affidavit submitted in support of its application for a warrant to search Dobkowski's residence and its failure to furnish the letter dated September 14, 1992 seized from Dobkowski's residence violated Kelly's right to due process of law, we vacate his conviction and remand for further proceedings consistent with this opinion.

*REVERSED.*

11. Kelly asserts that the letter of September 14, 1992 constituted a statement by a Government witness that related to her direct testimony, and therefore, the Government should have produced it under the Jencks Act. *See* 18 U.S.C.A. § 3500. The Government, however, claims that it was not required to produce this letter under the Jencks Act because the subject matter of the letter did not relate to Dobkowski's direct testimony. It was Kelly's position that this document related to Dobkowski's direct testimony that she was a high-ranking official with the EPA; the Government contends that its question to Dobkowski concerning her employment was merely an introduction, and thus her testimony concerning her employment was not related to her testimony against Kelly. While we need not address this question in view of our conclusion that the letter should have been disclosed as *Brady* material, it appears that the Government's position lacks merit. *See United States v. Brumel–Alvarez*, 991 F.2d 1452, 1463 (9th Cir.1992) ("The Jencks Act requires the government to produce any written statements by a government witness that relate to the subject matter of any direct testimony by the witness."); *United States v. Derrick*, 507 F.2d 868, 871 (4th Cir.1974) (noting that statements relate to the direct testimony of a witness, when they "relate generally to the events and activities testified to") (internal quotation marks omitted).

12. We decline to address Kelly's assertions that reversal is warranted by the failure of the Government to produce pages from Dobkowski's daytimer, some of the entries of which could be viewed as indicating that she fabricated her version of the events, and the maroon diary. In view of our conclusion that *Brady* violations constitute reversible error, we need not address Kelly's other contentions that the district court abused its discretion in refusing to inquire on voir dire about potential bias against Kelly, in limiting his cross-examination of Dobkowski, in limiting him to one witness to demonstrate Dobkowski's involvement in the Circle of Friends, and in permitting the Government to introduce the testimony of Wendy Mann in rebuttal or his argument that the district court erred in its sentencing of him.