**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 15-4032**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

W. WAYNE PERRY, JR.,

Defendant - Appellant.

─────────────

**No. 15-4050**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANGELA PERRY,

Defendant - Appellant.

─────────────

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. Mark S. Davis, District Judge. (2:13-cr-00156-MSD-DEM-1; 2:13-cr-00156-MSD-DEM-2)

─────────────

Argued: March 24, 2016              Decided: August 9, 2016

─────────────

Before AGEE and WYNN, Circuit Judges, and Thomas D. SCHROEDER, United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Joseph Ray Pope, WILLIAMS MULLEN, Richmond, Virginia; Andrew Michael Sacks, SACKS & SACKS, Norfolk, Virginia, for Appellants. Alan Mark Salsbury, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** John S. Davis, WILLIAMS MULLEN, Richmond, Virginia, for Appellant W. Wayne Perry, Jr. Dana J. Boente, United States Attorney, Alexandria, Virginia, Melissa E. O'Boyle, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

W. Wayne Perry, Jr., and his wife, Angela Perry, were convicted of conspiracy to commit healthcare fraud in violation 18 U.S.C. § 1349 (Count 1), healthcare fraud in violation of 18 U.S.C. § 1347 (Counts 2-5), making false statements in connection with a health care benefit program in violation of 18 U.S.C. § 1035 (Counts 6-13), alteration of records in violation of 18 U.S.C. § 1519 (Count 14), and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) (Counts 15-18). These charges arose from a scheme to overbill Virginia's Medicaid program through Mr. Perry's home healthcare company, Community Personal Care, Inc. ("CPC"). On appeal, the Perrys raise various challenges to the sufficiency of the evidence presented against them, the government's use of certain Medicaid regulations related to "respite care" services, and the district court's instructions to the jury on the meaning of the term "willfully." After careful review, we reject each challenge and affirm the convictions.

I.

The principal evidence at trial, viewed in the light most favorable to the government, as it must be at this stage, see United States v. Perkins, 470 F.3d 150, 160 (4th Cir. 2006), is as follows:

The Virginia Department of Medical Assistance Services ("DMAS") administers Medicaid programs for low income individuals

3

in Virginia. One such program, the Virginia Medical Assistance Program ("VMAP"), authorizes certain companies to provide in-home healthcare services. VMAP reimburses these companies for providing basic assistance to patients in their own homes, with the goal of avoiding unnecessary expenses and discomfort associated with institutionalized care.

VMAP authorizes two types of in-home care, known as "personal care" and "respite care" services. Personal care services assist the patient with the activities of daily living, such as bathing and dressing. Registered nurses prescribe an approved plan of care that details the activities with which the patient needs assistance and establishes the maximum number of hours per week that providers may bill for providing these services. Invoices to DMAS, however, must be based on the actual amount of time that aides spend providing these services, rather than the maximum number of hours authorized by the plan of care. In addition to personal care services, DMAS also authorizes respite care services for patients with an unpaid primary caregiver, often a family member of the patient. Respite care refers to services provided on an episodic or periodic basis to fill in for the designated primary caregiver when he or she is sick, absent, or otherwise needs a break from the responsibilities of caring for the patient.

4

See 12 Va. Admin Code. § 30-120-766(A)(2) (2008).[1] DMAS authorized up to 720 respite care hours annually for each patient's primary caregiver prior to July 1, 2011, and 480 hours annually thereafter.

Mr. Perry founded CPC in 1998 and served as its president and CEO, while Mrs. Perry served as his executive assistant and oversaw various staffers. Over a period of several years, CPC employees engaged in a widespread practice known as "billing by the plan of care," that is, billing DMAS for the maximum number of personal care hours authorized by a patient's plan of care, rather than by the number of hours documented on the health aides' timesheets, as required by DMAS regulations. See, e.g., J.A. 260, 328–29. At least one CPC employee raised concerns about this practice with Mr. Perry after taking a Medicaid billing and coding course from a nearby college. Mr. Perry allowed the employee to bill from the aide records for one week, but instructed her to go back to billing by the plan of care after learning that billing by the aide records resulted in significantly lower billing. When the employee spoke with Mrs. Perry about the practice, Mrs. Perry responded, "That is what Wayne wants us to do, so that's what we do." J.A. 194–95. CPC employees also routinely billed for respite care services that no CPC employee actually provided.

---

[1] The conspiracy in this case existed from 2009 to 2013. For purposes of these definitions, the pertinent Virginia regulations did not change materially between 2008 and 2013.

5

CPC employees also engaged in an extensive effort to conceal the fraudulent billing scheme. Beginning in 2010, Mr. Perry engaged Allison Hunter-Evans, a former DMAS employee, to identify problems with CPC's records and documentation. When Hunter-Evans raised concerns with Mrs. Perry about billing by the plan of care, Mrs. Perry shook her head and responded, "It will be the death of him," referring to her husband. J.A. 1193-94. Yet no corrective action was taken. Instead, CPC employees doctored records in response to the deficiencies identified by Hunter-Evans. Mr. Perry also paid Hunter-Evans to have lunch with a former colleague at DMAS in order to glean non-public information about an upcoming audit of CPC. When Hunter-Evans reported the specific time period that was likely to be the subject of the audit, Mr. Perry responded via email, "Now that's what i am talki= ng about!!!! I WILL START SAVING MY $$$$$.I will be ready!" J.A. 3542; see also J.A. 1171. CPC employees spent the weekend before the audit forging signatures, adding hours to timesheets, and otherwise doctoring records. Although Mr. and Mrs. Perry were both present in the office that weekend, Mrs. Perry primarily directed the effort to conceal the fraud, even assigning a specific employee to forge signatures because she was the "artistic one." J.A. 273-76.

In February 2014, a grand jury indicted the Perrys on eighteen counts of healthcare fraud, conspiracy to commit healthcare fraud, making false statements relating to health care, alteration of

6

records, and aggravated identity theft.  The conspiracy was alleged to have existed from January 2009 through January 2013, with the substantive counts occurring at various times throughout that period.  Hunter-Evans, who was also indicted in this case, pleaded guilty to alteration of records (Count 14) and testified against the Perrys at trial.  More than a dozen former CPC employees also testified against the Perrys, several under grants of immunity from the government.  The jury convicted the Perrys on all counts.  This appeal followed.

## II.

The Perrys first challenge the sufficiency of the evidence against them on Counts 2-13 and 15-18.  Counts 2-5 charged the Perrys with health care fraud in violation of 18 U.S.C. § 1347.  In order to establish these counts, the government was required to prove that the Perrys knowingly and willfully executed a scheme to defraud DMAS.  See United States v. McLean, 715 F.3d 129, 137–38 (4th Cir. 2013).  Counts 6-13 charged the Perrys with making false statements relating to health care matters in violation of 18 U.S.C. § 1035.  In order to establish these counts, the government was required to prove that (1) the Perrys made a materially false statement; (2) in connection with the delivery of or payment for health care benefits; (3) in a matter involving a health care benefit program, as that term is defined in 18 U.S.C. § 24(b); and (4) the Perrys acted knowingly and willfully.  See United States

7

v. Natale, 719 F.3d 719, 742 (7th Cir. 2013). Finally, Counts 15-18 charged the Perrys with aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). In order to establish these counts, the government was required to prove that the Perrys (1) knowingly transferred, possessed, or used; (2) without lawful authority; (3) a means of identification of another person; (4) during and in relation to a predicate felony offense. United States v. Abdelshafi, 592 F.3d 602, 607 (4th Cir. 2010). Health care fraud qualifies as a predicate felony offense for the purposes of § 1028A. Id.

"A jury's verdict must be upheld on appeal if there is substantial evidence in the record to support it." United States v. Foster, 507 F.3d 233, 244 (4th Cir. 2007). The court must view the evidence in the light most favorable to the government and assume that the jury resolved all contradicting evidence in the government's favor. Id. at 245. "[T]he uncorroborated testimony of one witness or of an accomplice may be sufficient to sustain a conviction." United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997). In addition, "the existence of a conspiratorial agreement need not be proven by direct evidence, but may be inferred from the facts and circumstances of the case." United States v. Laughman, 618 F.2d 1067, 1074 (4th Cir. 1980). Ultimately, in reviewing for substantial evidence, "[t]he relevant question is whether, after viewing the evidence in the light most

8

favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

The Perrys do not dispute that, from at least 2009 through 2013, CPC employees submitted fraudulent invoices to DMAS, used patient identification numbers without permission, and altered timesheets and other records in an attempt to conceal their fraud from auditors. At trial, they claimed that CPC employees conceived and executed this scheme without their knowledge or participation. On appeal, however, the Perrys do not argue that the evidence against them was insufficient to support their convictions for conspiracy to commit healthcare fraud and altering records.[2] Nevertheless, the Perrys both argue that insufficient evidence exists to convict them of the substantive counts relating to respite care fraud, and Mrs. Perry contends that the evidence was insufficient to convict her of the substantive counts relating to personal care fraud.[3] We disagree.

---

[2] Although the Perrys have not expressly challenged the sufficiency of the evidence supporting their convictions for conspiracy to commit healthcare fraud (Count 1), we note that the evidence discussed below makes plain that there is sufficient record support for their conspiracy convictions.

[3] The Perrys also challenge the sufficiency of the evidence supporting their convictions for aggravated identity theft. The identity theft counts in the indictment involved the use of Medicaid identification numbers on fraudulent personal and respite care invoices. The Perrys have not raised any sufficiency

Ample evidence was presented at trial to support the jury's conclusion that Mr. Perry participated in the respite care fraud scheme. Former CPC employees testified that when CPC's revenues were down, Mr. Perry imposed quotas for respite care hours and threatened to fire staffing coordinators who failed to meet these quotas. Several employees testified that Mr. Perry would often instruct them to "run the respite" or "burn up the respite," see, e.g., J.A. 266–67, 544, 2282, and that they understood these instructions as directions to submit invoices for respite hours that were not worked or to provide respite services that were not requested by the patient or primary caregiver. There was extensive evidence of multiple employees falsifying respite records to bill DMAS for scores of respite hours that were never worked. And there was evidence that Mr. Perry's demands were sometimes communicated late in a billing cycle or toward the end of a fiscal year such that he would have known it was unlikely – if not impossible – for

---

arguments specific to the aggravated identity theft counts. As a result, this Court will treat the sufficiency of the evidence supporting the aggravated identity theft counts as rising and falling with the personal and respite care fraud counts.

The Perrys also argue that the aggravated identity theft statute, 18 U.S.C. § 1028A(a)(1), does not reach the type of conduct charged in this case. This Court has already rejected this argument. See Abdelshafi, 592 F.3d at 606–10. The Perrys raise the issue solely to preserve it for further review because, as they acknowledge, this panel cannot overrule a published decision of a prior panel. Jones v. Angelone, 94 F.3d 900, 905 (4th Cir. 1996).

staffing coordinators to meet his quotas without billing for hours that no CPC employee actually worked.

There was also evidence of a financial incentive for the scheme. In 2010, for example, CPC billed approximately $90,000 per month for respite care services over the first six months of the year, but approximately $150,000 per month over the last six months of the year. Mr. Perry told employees that he used respite "to pay the bills," and even when he wasn't demanding that employees meet specific respite quotas, he authorized aides to bill for unrealistic numbers of respite care hours – up to 250 hours per two-week cycle – in order to achieve this goal. J.A. 688–89. According to one employee involved in the scheme, Mr. Perry "knew what was going on." J.A. 735. That conclusion was supported by evidence that CPC paid employees who engaged in the fraudulent respite billing scheme with separate bonus checks that required Mr. Perry's approval, some of which more than doubled the employees' normal compensation checks. In one instance, an employee was paid by separate bonus check in an amount that exceeded twenty-four hours per day for a two-week period.

Mr. Perry conceded that he directed employees to "run the respite" but points to testimony that no one ever heard him direct the falsification of respite timesheets. He contended that his urging of employees to encourage patients and caregivers to use respite care was legal and that he was unaware of the fraud. To

11

be sure, some CPC employees testified that "some" respite burning was "on [their] own" in order to benefit themselves personally. E.g., J.A. 578, 584, 647. As the district court noted, however, a large portion of this case came down to credibility. A rational trier of fact could find the government's witnesses to be credible, particularly in light of the large financial benefit Mr. Perry reaped as a result of the respite care fraud scheme which extended for almost three years, as well as the substantial evidence showing that Mr. Perry also orchestrated CPC's personal care fraud scheme.

We reach the same conclusion as to Mrs. Perry, who was Mr. Perry's executive assistant and considered by employees to be a "boss" like Mr. Perry. J.A. 538. There was evidence that she was involved with and approved of the widespread and ongoing misconduct at CPC. With regard to personal care specifically, at least one witness testified that Mrs. Perry knew about CPC's practice of billing by the plan of care rather than by the actual hours worked and that Mrs. Perry advised, "[T]hat is what Wayne wants to do, so that's what we do." J.A. 194-95. Mrs. Perry also actively directed employees to falsify aide records and was "in charge" during the weekend meetings to prepare for the audit, when employees were directed to fabricate aide record entries to match the plan of care hours that had been billed to conceal CPC's fraud. J.A. 273-76.

With regard to respite care, Mrs. Perry conveyed Mr. Perry's quotas to the employees responsible for carrying out the fraud and threatened to fire a personal care aide for failing to meet her quota. When one employee expressed concern that the nurses might discover the respite fraud scheme, Mrs. Perry said that she would "handle the nurses." J.A. 205. Finally, Mrs. Perry shared Mr. Perry's motive for participating in the scheme because she depended on him to "provide" for her and her children. See J.A. 2470–71. As with Mr. Perry, a rational trier of fact could find the evidence discussed above to be credible.

Finally, the Perrys challenge the sufficiency of the evidence supporting Count 9 of the indictment, which charged them with violating 18 U.S.C. § 1035 for overbilling DMAS for personal care services for a specific patient, E.J., during the week of January 3-9, 2011. In contrast with their other sufficiency arguments, the Perrys do not claim that Count 9 involved a fraud committed by CPC employees without their knowledge. Instead, they contend that the government failed to prove that the invoice was fraudulent at all – that is, that CPC employees did not work the hours billed to DMAS in connection with Count 9.

The Perrys claim that their convictions on Count 9 were based solely on the absence from E.J.'s file of a timesheet documenting the number of hours worked by a CPC aide during the week in question. In addition, they point to testimony from E.J.'s nurse

13

and daughter that E.J. was not self-sufficient and could not go an entire week without care. In light of this circumstantial evidence that E.J. could have received her normal, approved amount of care, they argue, no reasonable jury could have convicted on this count "merely from the circumstance of a missing [timesheet] form." Opening Br. at 34.

Contrary to the Perrys' assertions, however, the government presented more than just a missing timesheet to support Count 9. The government offered the testimony of Mary McKay, the CPC home health aide assigned to E.J., who testified that she filled out and submitted timesheets when she provided services for E.J. The government also offered the testimony of CPC nurse Deedra Davis-Hussein, who testified that E.J. was mentally ill, sometimes refused care when she did not want to be disturbed, and was capable of refusing care for a week. Indeed, the evidence showed that CPC sometimes went days or even a full week without providing any care to E.J. For example, CPC did not bill DMAS for any personal care hours for E.J. for the week of October 18-25, 2010. Viewed in the light most favorable to the government, a reasonable juror could credit this evidence and conclude that the reason no timesheet existed for the week of January 3-9, 2011, was because CPC did not provide any personal care services to E.J. that week. Although the Perrys speculate that the timesheet could have been misplaced

14

or destroyed,[4] these possibilities do not undermine the evidence supporting the jury's verdict. As the district court noted, the government was not required to provide direct evidence that CPC employees did not work the hours in question, or to rule out every innocent explanation for the missing timesheet. Instead, "circumstantial evidence is treated no differently than direct evidence, and may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence." United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir. 1989). The Perrys' challenge to Count 9 is therefore rejected.

### III.

The Perrys also raise several challenges to their convictions on the counts involving respite care fraud. Counts 1, 2-5, and 10-13 involved CPC's billing for, among other things, respite care

---

[4] At trial, FBI Special Agent Kim Wright testified regarding, among other things, her review of CPC's records. Wright presented, without objection, a summary chart for services performed for E.J. See Fed. R. Evid. 1006. The chart indicated that for the week in question Ms. McKay's aide records reflected five hours worked for E.J. but that CPC billed forty-two hours. On appeal, the Perrys state that Wright's chart was wrong because "[i]n fact, [E.J.'s] patient file contained no timesheet for the week of January 3-9, 2011; that timesheet was missing completely, and no personal care hours were documented for the week." Reply Br. at 15. Even if, as the Perrys argue, the jurors were "misled by the summary chart about the personal care hours actually recorded for the week involved in Count 9," this would not help the Perrys insofar as neither scenario (five documented hours or zero documented hours) supports the hours billed.

15

services.  At trial, the government argued that the relevant respite care bills amounted to fraud because the company billed for respite care hours that no employee worked or, alternatively, for hours that employees worked on their own initiative without providing any benefit to the patient's primary caregiver.

The Perrys first argue that their convictions must be overturned because the government offered false testimony regarding DMAS respite care regulations.  "The Supreme Court long ago opined that, 'a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction.'" United States v. Bartko, 728 F.3d 327, 335 (4th Cir. 2013) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).  "This is true regardless of whether the Government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected."  United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994).  When the government offers false evidence that it knows or should know is false, a conviction based on that evidence "must be reversed when 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  Id. (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).

Before 2007, primary caregivers were required to live in the home with their Medicaid patients in order to qualify for respite care services.  12 Va. Admin. Code § 30-120-768(B) (2006).  DMAS

removed this live-in requirement in 2007, before the conduct charged in the indictment. See 12 Va. Admin. Code § 30-120-766(B)(2) (2007). However, the live-in requirement continued to be printed in the Virginia Medicaid Provider Manual until 2011. Two witnesses testified that the regulation may have changed before 2011, and counsel for Mr. Perry cited some of this testimony to the jury during closing arguments. By and large, however, both sides assumed at trial that the live-in requirement remained in effect until 2011 and solicited testimony to this effect. In addition, the government asked various primary caregivers whether they lived in the home with the Medicaid patients. Many of these family members testified that they lived far away from their patients and had never even heard of respite care.

The Perrys claim that testimony about the live-in requirement misled the jury into believing that they committed fraud by billing for respite care hours that CPC employees worked on behalf of primary caregivers who did not live with their Medicaid patients. If the government had presented this theory at trial, then the Perrys might have cause for overturning their convictions. See United States v. Moye, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (discussing the distinction between legally and factually insufficient theories of prosecution). But the government did not present this theory, nor did it so much as mention the live-in requirement during closing arguments. In fact, Mr. Perry himself

17

testified that before 2011, the primary caregiver had to live in the home.

Instead, the government stressed that testimony about the Medicaid regulations was offered only as background information and to help prove that the Perrys acted with fraudulent intent. As the government explained in closing arguments, testimony about the residences of particular family members was not offered to establish that CPC provided respite care on behalf of ineligible caregivers; instead, it was offered to establish that CPC did not provide respite care at all because any hours they may have worked could not have provided relief to family members who lived far away and had no day-to-day care responsibilities for the patient. In light of the Perrys' knowledge and familiarity with the respite care regulations, this provided evidence that the respite care billing was fraudulent and not merely a product of accident or mistake. The district court reinforced this point in its instructions to the jury. In light of the government's limited use of the testimony surrounding the live-in requirement and the district court's instructions, there is no reasonable likelihood that testimony about the live-in requirement affected the judgment of the jury.

The Perrys also claim that the government misled the jury into believing that primary caregivers must personally request respite care rather than communicating through their patients. As

with the live-in requirement, the testimony on this point was vague and muddled. A few government witnesses did appear to testify to this effect, including Special Agent Wright, who stated, "If there's not a caregiver that has ever requested respite, the hours billed are fraud." J.A. 1450. Mr. Perry himself also agreed that "the primary caregiver is the individual that's supposed to be requesting the use of the respite hours," though he added that requests "didn't always happen that way as a practical matter." J.A. 2205. On the other hand, at least one government witness stated that patients could call to schedule respite hours on behalf of their caregivers.

We are not convinced that the testimony cited by the Perrys was actually false; in context, these witnesses appear to have been referring to the particular individual for whose benefit respite care is provided, rather than the mechanics of how the caregiver communicates with the home healthcare company. In any event, this argument fails for the same reasons discussed above with regard to the live-in requirement. Testimony that particular primary caregivers did not request respite care was not offered to establish that CPC relied on improper channels of communication, but rather to establish that the respite care hours CPC claimed to have worked were not provided for the primary caregiver's benefit and, thus, did not qualify as respite care. In light of the Perrys' knowledge and familiarity with the respite care

19

regulations, this provided evidence that the respite care billing was fraudulent and not merely a product of accident or mistake. And as with the live-in requirement, the district court's instructions limited the jury to this permissible use of this evidence. Thus, there is no reasonable likelihood that this evidence impermissibly affected the jury's decision.

The Perrys next contend that the government impermissibly used violations of civil regulations as the basis for their criminal convictions. At trial, however, the district court clearly instructed the jury that the Perrys were not charged with violating civil regulations and that evidence of these regulations was admitted only to show their knowledge and intent. The government also stressed this point to the jury on multiple occasions. In light of these admonitions, as well as undisputed evidence that the Perrys were familiar with the regulations in question, there was no danger that the jury would convict them of fraud or knowingly making false statements simply because they violated DMAS regulations.

Finally, the Perrys argue that the government's theory of respite care fraud renders their convictions void for vagueness. "A statute is unconstitutionally vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, or if it authorizes or encourages arbitrary and discriminatory enforcement." McLean, 715

20

F.3d at 136. Here, DMAS regulations stated that respite care services may only be provided "because of the absence of or need for relief of those unpaid persons who routinely provide the care." 12 Va. Admin. Code § 30-120-766(A)(1) (2008). At trial, the government argued that hours billed for respite care services were fraud, even if CPC employees actually worked them, so long as the hours were worked without a request from the patient or caregiver and without regard for whether the caregiver needed relief.

Contrary to the Perrys' assertion, the regulations in question are not unconstitutionally vague. True, at least one witness testified that DMAS regulations governing respite care services are looser than those governing personal care services. But the DMAS regulations clearly provide that respite care services may only be used to benefit "an unpaid caregiver who requires temporary relief to avoid institutionalization of the individual." 12 Va. Admin. Code § 30-120-766(B)(2) (2008). At trial, almost every CPC witness — including Mr. Perry — testified that they understood this basic contour of the regulations. No witness expressed any doubt that billing for respite hours that either were not worked or that were worked without regard to the needs of an unpaid caregiver would be fraud. The Perrys' argument therefore lacks merit.

IV.

The Perrys next challenge the district court's instructions to the jury regarding the meaning of the term "willfully." Counts 2-13 of the indictment charged the Perrys with violations of 18 U.S.C. §§ 1035 and 1347. Section 1035 makes it a crime to "knowingly and willfully make[] any materially false, fictitious, or fraudulent statements or representations" in any matter involving a health care benefit program. Section 1347 makes it a crime to "knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice to defraud any health care benefit program." The district court instructed the jury that, for the purposes of these offenses, "[a] person acts 'willfully' . . . when that person acts deliberately, voluntarily, and intentionally." J.A. 2795; see also J.A. 2793 (instructing the jury that conduct is "knowing" when the actor is "conscious and aware" of his actions, rather than acting due to "ignorance, mistake, or accident").

The Perrys contend that a defendant must know that his conduct is unlawful in order to act "willfully" for purposes of §§ 1035 and 1347. Although the Perrys proposed a different instruction, they did not specifically object to the district court's

22

instruction at trial.[5]  As a result, we review this instruction

for plain error.  United States v. Nicolaou, 180 F.3d 565, 569

(4th Cir. 1999) (citing Fed. R. Crim. P. 52(b)).

An error is plain when it is "clear or obvious, rather than

subject to reasonable dispute."  United States v. Marcus, 560 U.S.

258, 262 (2010).  Conversely, an error is not plain when this

"court has never addressed [the issue], and the other circuits are

split on the issue."  See United States v. Wynn, 684 F.3d 473, 480

(4th Cir. 2012).

"[I]gnorance of the law generally is no defense to a criminal

charge."  Ratzlaf v. United States, 510 U.S. 135, 149 (1994).  The

First and Ninth Circuits have applied this general rule to

convictions under § 1035, holding that a defendant does not need

to know that his conduct is unlawful in order to act willfully for

the purposes of that statute.  United States v. Russel, 728 F.3d

23, 31–33 (1st Cir. 2013), vacated, 134 S. Ct. 1872 (2014); United

States v. Ajoku, 718 F.3d 882, 889–90 (9th Cir. 2013), vacated,

134 S. Ct. 1872 (2014).  However, the Supreme Court summarily

vacated those opinions and remanded the cases for reconsideration

---

[5] The Perrys proposed an instruction that defined willfully
as "voluntarily and intentionally, with intent to do something the
law forbids, and with knowledge that [the defendant's] conduct was
unlawful."  J.A. 4407.  The government proposed a similar
instruction.  See J.A. 2710 (defining willfully as requiring both
purpose and "knowledge that [the defendants'] conduct was, in a
general sense, unlawful").

after the Solicitor General adopted a position similar to that advanced by the Perrys in this case. See 134 S. Ct. at 1872. The Perrys also point to two Supreme Court decisions recognizing an elevated mens rea requirement for willfulness in other, unrelated criminal statutes. See Bryan v. United States, 524 U.S. 184, 196–200 (1998) (dealing in firearms without a license); Ratzlaf, 510 U.S. at 146–49 (restructuring financial transactions to avoid reporting requirements). Finally, the Perrys rely on two recent cases that cite the Bryan willfulness standard in reviewing the sufficiency of the evidence in a § 1347 claim. See United States v. Iwuala, 789 F.3d 1, 12 (1st Cir. 2015) (citing Bryan but equating knowledge of unlawfulness with intent to defraud); United States v. Franklin-El, 555 F.3d 1115, 1122 (10th Cir. 2009) (same).

The word willful has many meanings, which often vary depending on the context in which the term is used. Ratzlaf, 510 U.S. at 141. Section 1035 closely tracks the language of 18 U.S.C. § 1001, and courts have interpreted the two statutes as containing the same mens rea requirement. See, e.g., Natale, 719 F.3d at 739–42. This Court has endorsed jury instructions in the § 1001 context that were similar to the one given by the district court in this case. See, e.g., United States v. Daughtry, 48 F.3d 829, 831–32 (4th Cir. 1995), vacated on other grounds, 516 U.S. 984.

In light of the foregoing, the meaning of the term willfully in §§ 1035 and 1347 is, at a minimum, subject to reasonable debate.

24

Neither the Supreme Court nor this Court has directly addressed the issue, and cases discussing "willfully" can be used to defend and critique the district court's instruction. For present purposes, it suffices to say that Fourth Circuit law on this issue is not clear at present, and thus the district court's instruction was not plainly erroneous. See United States v. Olano, 507 U.S. 725, 734 (1993) (stating that an appellate court "cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law").

In addition, even if the district court misconstrued the meaning of the term willful, this would not warrant reversal of the Perrys' convictions. Jury instructions must be evaluated as a whole, and the failure to give a particular instruction does not warrant reversing a conviction unless the proposed instruction covered a point that was not substantially covered by the court's other instructions to the jury. See Noel v. Artson, 641 F.3d 580, 586–87 (4th Cir. 2011) (citing Henderson v. Kibbe, 431 U.S. 145, 153 n.10 (1977), and United States v. Lighty, 616 F.3d 321, 366 (4th Cir. 2010)). Here, the other instructions adequately ensured that the jury's verdict was based on a correct understanding of the law. Specifically, the district court instructed the jury on fraudulent intent, which it defined as acting "knowingly and with the intention or the purpose to deceive or to cheat . . . accompanied, ordinarily, by a desire or a purpose to bring about

25

some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." J.A. 2830. And the court instructed that false, fictitious, or fraudulent statements or misrepresentations are "untrue when made or when used and [are] known by the person making it or using it to be untrue"; as well as "made or used with the intent to deceive." J.A. 2838. Most importantly, the court instructed that good faith was a complete defense to all of the charges in the superseding indictment because it was "inconsistent with the intent to defraud or to obtain money by means of false or fraudulent pretenses, representations, or promises." J.A. 2803. And it explained that if a person acts "on a belief or an opinion honestly held," or with the "absence of malice or ill will, and [with] an intention to avoid taking unfair advantage of another," then the person acts in good faith and cannot be found guilty. J.A. 2803.

Viewed as a whole, then, these instructions ensured that "the jury actually made an equivalent or identical finding" as that contained in the willfulness instruction the Perrys argue should have been given. See United States v. Whitfield, 695 F.3d 288, 304 (4th Cir. 2012). Under these circumstances, any error was harmless and therefore not reversible, particularly under plain error review. See id.

Finally, the Virginia Provider Manual clearly stated that it was a crime to fill out invoices falsely, and Mr. Perry admitted

26

that he knew the type of conduct alleged in counts 2 through 13 was illegal. All he denied at trial was being part of that conduct. "No reasonable jury could have found that [the Perrys] intended to deceive or cheat the Federal Government but did not know that such conduct is unlawful, especially in light of the warnings" in the Virginia Medicaid Provider Manual and elsewhere. See United States v. Awad, 551 F.3d 930, 940 (9th Cir. 2009). Accordingly, the totality of the record supports no other conclusion but that the Perrys were guilty. Under these circumstances, the Court will not reverse on plain error review. United States v. Cedelle, 89 F.3d 181, 185–86 (4th Cir. 1996). For each of these reasons, we reject this challenge.

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.